Commonwealth *v.* Westwood, Appellant.

290

Argued September 29, 1936.  Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*William H. Coleman,* with him *M. Barney Cohen,* for appellant.

*Chauncey E. Pruger,* Assistant District Attorney, with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, November 23, 1936:
The appellant, James J. Westwood, was charged with

the murder of his wife, Martha. After trial he was convicted of first degree murder and sentenced to life imprisonment. This appeal followed.

About 1:45 A. M.,* July 10, 1935, Bertha Westwood, a daughter, aged 19 years, heard shots in her mother's bedroom located on the second floor of the Westwood home. She entered the room and saw blood flowing from her mother's face. The other children, Martha, aged 12, and Jimmy, aged 7, also came in. Bertha notified the police station that somebody had shot her mother, and asked them "to find Daddy." The records of the telephone company show that this call was made at 1:48 A. M. Her father arrived at the house about 3:30 A. M. The deputy coroner testified that three bullets imbedded in the head and body of Mrs. Westwood caused her death. She was thirty-seven years of age.

Early in the evening of July 9, 1935, the defendant took his wife and Martha and Jimmy to a moving picture show, where he left them to go to his office, he being a Justice of the Peace of the Borough of McKees Rocks. About 10 P. M., he, in company with Thomas Drexler and Mrs. Catherine Cole (a married woman) went to Carnegie. They returned to McKees Rocks about midnight. Peggy Moran joined the party at the latter place. Miss Moran became Mrs. Belmas on October 17, 1935. These four persons then proceeded in Drexler's car to Peyton's roadhouse, about six miles from the defendant's home, arriving at 12:15 A. M., July 10th. The defendant claims that he did not leave this roadhouse until he departed with the other members of the party about 2:30 A. M., except for an interval of about fifteen minutes when he went out of the roadhouse into Drexler's parked automobile with Miss Moran. He claimed that he then re-entered the roadhouse. Mrs. Belmas (nee Moran) testified that when they left the car the de-

---

* The hour time specified in this opinion is Daylight Saving Time.

fendant told her to go in one door of the roadhouse and he would enter by another. She next saw the defendant talking to two men at the bar. Later he told her to hurry up and finish her drink. The following questions and answers appear on the record: "From the time that you [Mrs. Belmas] say this defendant, Westwood, talked to a man at the bar, did you see him again that evening until he came in and told you to finish your drink and leave? A. No. Q. Can you tell us about how long he was absent? A. About half an hour. Q. When they [Westwood and Drexler] came back again what did they say to you? A. Well, Jimmy said, 'Hurry up, drink up, we have to be in Brookline.'" She fixed this time at 2:30 A. M.

A neighbor, named Sophie Sehar, who lived in the third house from Mr. and Mrs. Westwood, said that she awoke on the morning of July 10th, with a baby who was "teething." From a roomer who came in, she learned that it then was "twenty minutes of two." About seven minutes later she heard some shots. She said: "I hear one shot real strong . . . then another shot come and I got up and looked through window. As soon as I go to window, there was third shot come. . . . I hear like steps creep or something, and I look and there was Mr. Westwood. Westwood come out of gate." She was asked, "Whose gate?" She answered, "No. 103, where he was living. . . . He looked up and down and then come first face to me. When he was close to me, I was took my head out of window because I was scared." She added, "When he was real close, I see clear, good, like I see you or anybody else here. . . . There was real light by window." According to her testimony and that of others, good visibility was assured her by near-by electric lights and by moonlight. Mrs. Sehar went to another window and again saw Westwood. She said: "He was walking pretty slow. . . . Then I look with my girl out window. I see him cross Munson Avenue, walk pretty fast, but I don't see him no more. I hear car

start." Then she heard Bertha Westwood scream: "My Mother is shot." She said, "Somebody asked her [Miss Westwood] who," and the latter answered: "My father shot my mother. Look in the yard for him." The witness told her husband what had happened. He struck her and "pulled her by the neck" and told her to "shut up. Don't say anything." She subsequently made statements to casual questioners, describing in general terms, but in terms inappropriate to Westwood, the man she saw leaving the Westwood home. One witness testified that on "the morning after" the shooting he heard Mrs. Sehar say to an insurance agent (who was not called as a witness) that the man she saw coming from the Westwood home right after the shooting was "too big to be Jimmy." When asked about this while on the witness stand, Mrs. Sehar said: "So many ask me questions, I was scared." She explained that her husband had threatened her and her daughter if they told that they had seen Westwood at the time and place stated. Mrs. Sehar reported to her parish priest three weeks later that it was Westwood she saw coming out of the gate. She also told her lawyer the same thing about six or seven days after the homicide. As to her later actions on the morning of July 10th, she testified: "I went upstairs. I had prayer book and I write in prayer book if something happens to me so they know who was it. It was Westwood. I says that was Westwood killed his wife." She not only put this in her prayer book, but noted the date. She had known Westwood since 1920. When asked if she was positive in her identification, she replied: "I sure am. I can't make no mistake. I see him like anybody else. I know him close. I know him long."

Her daughter, Anna, aged 18, heard two shots. Her mother called her. Both looked out of the window. Anna testified: "He [Westwood] was right beside the gate from which he is supposed to have come out of the yard, Westwood's yard. . . . He took a quick glance

at his home, and then I knew very well it was Mr. Westwood." Later she told certain persons she could not identify the man she had seen leaving the Westwood home that morning, but, like her mother, she attributed such statements to her father's angry orders. As a witness, she positively placed the defendant at the scene of the crime.

Walter Monaghan, assistant county detective, testified that he met the defendant after the homicide. He had previously arranged to go fishing with constable Meisner, and have the defendant come to the house for them. After dressing he looked at his watch and it was 2:26 A. M. "The car was parked [near by]. Westwood and a woman were sitting in the front seat." Another woman was in the rear seat. They drove to the McKees Rocks police station. George Matovich came out and asked the defendant, "Have you been to your home?" The reply was: "No." Matovich said: "You better get down there, you wife's shot." The defendant said: "Come on, Walter." The witness was asked if Westwood asked Matovich anything about the shooting. The answer was, "Just what I stated is what happened." They went to the Westwood home, arriving about 3 A. M. A policeman there informed them that Mrs. Westwood was dead. Westwood then laid down over his wife's feet. The witness said: "Come on, Jimmy. Get up out of there." He helped him up. "There were tears in Westwood's eyes." Monaghan asked him if he knew of any reason for this shooting. The defendant replied, "I have no enemies." He was then asked if his wife had any enemies. He replied: "No, she was a good woman." After talking to Mrs. Sehar early that morning Monaghan again interrogated the defendant about this shooting. The latter said: "I have no reason. I have had no warning." Monaghan testified that William Westwood, defendant's brother, said to defendant at about 4 A. M.: "My God, Jimmy, why did you have to do this?" The latter answered: "I didn't do this. I can prove I was

with Walter [Monaghan]." As a matter of fact, the defendant was not "with Walter" until at least forty minutes after the shooting. Monaghan was asked: "Did he [the defendant] do anything? A. He did not." The defendant's brother, William Westwood, corroborated Monaghan as to the accusation he [William] made to defendant and as to the defendant's reply except that the brother said that defendant declared he was "with Walter and Tim [Drexler]."

A neighbor of defendant testified that on the morning of July 10, 1935, the defendant had a bull terrier dog, that when strangers entered the Westwood home, the dog "would bark and leap around," and that when Westwood came home "the dog wouldn't bother at all." Another witness testified that he knew this dog and that the dog would keep barking and growling when strangers came near the house but that when Westwood came into the house, the dog walked up to him and did not make any noise. A woman who lived next door to the Westwoods testified that she came home from work on the morning of July 10th about 1:15 A. M., and that she had lunch and then went to bed, and that her own little dog began growling. She tried to keep him quiet but could not do it. Just then she heard two shots, and then she heard a voice screaming, "Someone shot my Mother." She testified that before the shooting she did not hear the Westwood dog bark or growl though her windows were open. When she went to the Westwood home she saw the Westwood bull dog in the kitchen.

The Commonwealth offered expert testimony to the effect that there were particles of partially burned gunpowder on the defendant's right hand near and back of his index and ring finger. Shortly after Mrs. Westwood was shot, about 4:30 or 4:45 A. M., July 10th, Assistant County Detective Monaghan made a "paraffin test" of defendant's right hand and his own right hand and Tim Drexler's right hand. Hot paraffin was placed next to the skin. Cotton was placed on that and then another

coat of paraffin added. The paraffin was then lifted. These "moulds" were labeled, wrapped up and taken to the district attorney's office. They were later subjected by two chemists, Dr. Muehlberger and F. C. Buckmaster, to the "diphenylamine test" or so-called "lungee reaction." This was described as "a reaction primarily for nitrates and certain other oxidized substances, a standard test known for possibly fifty to seventy-five years." The first named chemist described gunpowder as "being rich in nitrates." He was asked this question: "Assuming that Martha Westwood was shot at about 1: 45 A. M. on the morning of July 10, 1935, and that sometime para wax impression was taken of the right hand of the defendant; that an examination of this wax mould with a high powered microscope disclosed seven black specks resembling burned black powder, located mostly along the index finger, and some on the back of the hand, as far over as the ring finger; that upon the application of the lungee reagent they turned from a black to a deep blue color. What in your opinion were the black specks found on the hand of the defendant?" He answered: "Under the circumstances, I don't see how any other explanation is possible of these specks than that they were residues of gunpowder." He testified that on the wax moulds made of the right hands of Drexler and Monaghan he found "nothing at all; no particles which reacted positively to the diphenylamine test."

Chemist Buckmaster testified he made a microscopic examination of the moulds and found the presence of small black specks on the Westwood mould and none on the other two moulds, (that is, the moulds of Monaghan and Drexler). He applied a drop of the lungee reagent to these spots. He said these specks "were similar in appearance to specks of partially burned gunpowder. Upon adding a drop or more of lungee reagent to these spots an intense blue color with comet tail formations was immediately apparent." He identified seven of these black specks on the mould of the defendant's right hand.

He said that when these black specks had the reagent applied to them they became an intense blue with comet tail formations, "it slowly changes color, it goes to a green, to a green yellow." He was asked: "After that, did you take specks of gunpowder, that you knew to be gunpowder and apply the same reagents to them? A. I did." He said the reaction he got from the application of the lungee reagent to the known specks of gunpowder was identical to the reaction he got from the specks treated on the paraffin mould of the hand of the defendant.

In order to show ill-will or malice on the part of defendant, the Commonwealth offered considerable testimony to the effect that the defendant had not been on friendly terms with his wife, that he had long been intimate with other women, that he constantly remained away from home until one, two and three o'clock in the morning, that about six weeks before the homicide he had endeavored unsuccessfully to have a property which was in his wife's name, and which was "a couple of doors away" from the temporary home they were occupying at the time of the homicide, and which had been recently remodeled, so conveyed as to vest in him and her an estate by entireties, and that when she, at his office, declined to go through with this plan, he upbraided and swore at her, and when she ran out of the door, he ran after her and when he came back he, in profane language, declared that he would "knock her block off." One witness declared that defendant was chasing his wife out of his office at the time stated and when she came out and went down the street, she was in tears. The defendant denied any ill treatment of his wife and declared that he loved her and that the proposal for the property transfer was his wife's and not his. His daughter, Bertha, corroborated him as to the suggestion for this transfer having been her mother's. He denied improper relations with other women and stated that if he was out late nights it was because his business kept him

out or he was bowling or playing cards. The defendant's daughter, Bertha, declared that there never was any occasion for her or any other member of the family to have any fear of their father. She testified: "He always treated me the best any father could."

Defendant denied the crime charged and set up an alibi. He claimed that he was at the Peyton roadhouse between 12:30 and 2:30 A. M., on July 10th and that he was not out of there except when he was in the car about fifteen minutes with Peggy Moran. The proprietor of the roadhouse, his wife, the headwaiter, a patron, two entertainers, and Drexler, a constable who "worked out of defendant's office," all placed the defendant "at the roadhouse" at an hour so close to the time of this homicide as either to preclude the possibility or make it unlikely that defendant was his wife's slayer. The times severally fixed by these witnesses in the above order, as "the time" they saw defendant at Peyton's roadhouse that morning were, respectively, as follows: *1:45, 1:53, 1:45, 1:30, 1:50, 1:35.* Drexler said the defendant went out to his (Drexler's) car "close to quarter after one" and returned with Peggy Moran "twenty or twenty-five minutes later." Catherine Cole, who was a member of the Westwood roadhouse party from 10 P. M., July 9th, until 2:30 A. M., July 10th, testified as a defense witness that Westwood was out of the roadhouse with Peggy Moran about 1:15 A. M., and returned "from twenty to twenty-five minutes later." On cross-examination she said: "I judge they were gone about half an hour." She denied that she told Martha Riley that Westwood had been away from the party "about an hour." Martha Riley was called in rebuttal and declared that "the night of the morning Mrs. Westwood was killed" Mrs. Cole said to her (the witness): " 'I am worried because Jim left out there,' and she said, 'He and Peg went out. They were gone a long time, at least an hour, maybe more.' " Mrs. Riley was corroborated by her husband.

On behalf of defendant there was also called a chemist who testified that he had taken moulds from different hands and tested them to see whether or not the diphenylamine test would give a blue reaction, and that there were thirteen different substances which would give such a reaction. In these substances he included "ordinary soot as we know it here in Pittsburgh," sodium perborate tooth powder, Pebecco tooth paste, cigar ashes, cigarette ashes, and different kinds of matches. He testified that nitrate was an ingredient of gunpowder and that nitrate, if found on one's hand by tests such as made by the experts for the Commonwealth, could come from any one of many substances other than gunpowder. He stated that the test relied upon by Commonwealth's experts to detect the presence of gunpowder was not an infallible one for that purpose.

There also appeared on behalf of defendant twenty-three character witnesses who testified that he had a reputation of being "a peaceable, quiet and orderly man."

The issues in this case were clear and the evidence weighed against the defendant. The Commonwealth relied in part upon the testimony of Mrs. Sehar and her daughter, whose identifications of the defendant as coming from the scene of the crime a moment or two after its commission, were positive. Their explanations as to why they made inconsistent statements when beset by many interrogators during the days following the shooting were for the jury's consideration. Such inconsistencies do not affect testimony's admissibility: *Com. v. Alessio*, 313 Pa. 537, 544, 169 A. 764.

The unexplained presence of specks of partially burned gunpowder on defendant's right hand a few hours after the shooting—as chemists found and testified—was, if the jury found such to be the fact, significant. If the victim had been stabbed instead of shot, the unexplained presence shortly thereafter of human blood on the right hand of one who had an opportunity to commit the crime, would have been significant.

There was testimony by witnesses who had made driving tests appropriate in time and place, that an automobile could be driven early in the morning from the Peyton roadhouse to the Westwood home and return in from fifteen to twenty minutes. There was evidence that the defendant was away from the roadhouse at least a half hour between 1 and 2 A. M., July 10th.

Police officers testified that the defendant gave them no aid and apparently made no effort to apprehend his wife's assassin. Defendant on cross-examination was asked whether he had not said to a member of the State Police force that he did not care who killed his wife. He denied this; the officer was called in rebuttal and testified that defendant had said to him that "he [defendant] was not interested in knowing who killed his wife."

The Commonwealth called attention to defendant's strange conduct when, after he was informed that his wife had been shot, he exhibited no anxiety as to whether she was alive or dead and no eagerness to track down her assailant. Equally strange was the fact that he exhibited neither anger nor surprise when his brother accused him of killing Mrs. Westwood, and to that accusation he made no denial except the equivocal interrogatory: "How could I? I was with Walter," the latter statement being untrue.

The Commonwealth plausibly argued that the defendant's conduct after the homicide betrayed a guilty conscience. His words and acts were not the normal words and acts of an innocent husband suddenly apprised of the startling fact that his wife had been foully murdered. Rather they bespoke a mind already possessed of a knowledge of the crime, a mind weighted with its guilty secret and already planning an exculpatory alibi. "Unnatural deeds do breed unnatural actions; infected minds to their deaf pillows will discharge their secrets."

There being abundant evidence to justify the verdict, the question is: Was there reversible error in the trial?

The first assignment of error is based upon the sentence of defendant. The second is based on the court's refusal to grant a new trial. These are overruled.

Assignments 3, 4, 5, and 6 relate to the admission of the testimony of Walter Monaghan as to the accusation made by defendant's brother after the shooting, to the district attorney's cross-examination of defendant as to his brother's accusation, and to the refusal of the court to strike out all the testimony as to this accusation. Appellant relies upon the case of *Com. v. Johnson*, 213 Pa. 607, 63 A. 134. There this court said: "Statements made in the presence of one accused of crime can be put in evidence against him only when his silence under the circumstances is ground for the inference of his assent to their correctness. The statements offered by the Commonwealth, having been promptly and explicitly denied, could not be received as tending to show an admission by the appellant." In the case at bar there was no explicit denial by defendant of his guilt when the accusation was made. On the contrary, defendant was obviously attempting to construct an alibi by saying that he was with an assistant county detective at the time of the homicide. The falsity of his attempted alibi was more inculpatory than silence would have been. The Commonwealth was entitled to have this equivocal and inferentially incriminatory denial go to the jury as a circumstance upon which, with other circumstances in the case, the jury might base a verdict of guilty. The appellant cites the case of *Com. v. Sydlosky*, 305 Pa. 406, 158 A. 154, in which it was held that the rule that statements made in the presence of defendant cannot be used against him unless he acquiesces in them affirmatively or by silence, does not apply *where the defendant himself and other witnesses testify that such statements were made* (italics supplied). We have the following situation in the case at bar which makes that principle applicable. Samuel Riddle, Assistant County Detective, testified that he was in the Westwood home after the homi-

cide when defendant's brother came in and said to defendant: "My God, Jim, why did you do it? Why did you have to kill her?" and defendant answered, "Well, Bill, how could I? I was with Walter." This was not an unequivocal denial and no objection was made to this testimony. Defendant himself testified on direct examination that his brother made the above statement on the morning of the homicide. He said that his answer was: "Will, I couldn't do this. I was with Walter Monaghan when I found it out." In *Com. v. Lenousky*, 206 Pa. 277, 55 A. 977, it was held that on the trial of an indictment for murder against a man who did not understand the English language, the testimony of an absent witness given at a preliminary hearing before a justice of the peace, in the presence of the prisoner and in the language which he spoke and understood, is not admissible, where it appears that the prisoner was not represented by counsel at the preliminary hearing, and was not informed of his right to cross-examine. The admission of such testimony, however, does not call for a reversal, where the only statement contained in the testimony which could affect the prisoner injuriously was abundantly established at the trial by other testimony, and was virtually admitted by the prisoner himself. The assignments based upon the above testimony of Walter Monaghan are overruled.

The 7th assignment is based upon the court's overruling the objection of defendant's counsel to the following question asked of defendant's brother: "What reason did you have for accusing him in that question, before you knew anything about how that murder happened?" This question should have been excluded. It might have elicited an answer highly prejudicial and yet based on conjecture or hearsay. However, the question proved to be harmless. The witness gave no reason for his accusation. On the contrary, he said: "I wasn't accusing him; I had no reason whatever to think he done it." The accusation (for such it was) and the de-

fendant's response thereto doubtless weighed against the defendant, but all *that* was competent evidence. The question asked the brother as to why he made the accusation did the defendant no harm, for the answer given was not responsive, and, such as it was, it rather helped the defendant. This assignment is overruled.

The 8th assignment relates to the admission of testimony as to defendant's lascivious conduct with a young woman about two years before the homicide. The 9th assignment is based upon the court's refusal to exclude testimony in relation to similar conduct on the part of the defendant toward a young woman about a month before the homicide. It is well settled that "where the victim of the crime is the spouse of the accused, evidence tending to show want of affection upon the part of the accused or infatuation with another, is admissible on the question of motive": 30 *C. J.*, section 409, page 185. In the case of *Com. v. Edwards,* 318 Pa. 1, 178 A. 20, in which the defendant was accused of murdering a woman with whom he had been intimate, this court sustained the admission by the court below of letters showing the defendant's immoral relations with another woman. These assignments are overruled.

The 10th, 11th and 12th assignments of error are based upon the admission of testimony of witnesses as to defendant's abusive language toward his wife. The relations between a defendant and his alleged victim are always a proper subject for inquiry. It may be that no adequate motive was shown in the crime charged here, but as this court said in *Com. v. Danz,* 211 Pa. 507, 60 A. 1070: "It is urged as a reason for the reversal of this judgment that no motive was disclosed for the crime charged. . . . Though the evidence against her [the defendant] was circumstantial, if it satisfied the jury of her guilt, she is not to be saved from the consequences of her crime because a motive for its commission, however important a matter the same might be, had not been disclosed. There can be no escape from punishment for

crime when all the elements of it are proved, whether the evidence be positive or circumstantial, simply because the motive lies hidden in the heart of the only one who knows it." See also *Com. v. Delfino*, 259 Pa. 272, 102 A. 949. These assignments are overruled.

The 13th, 14th, 15th, 16th and 17th assignments of error are based upon the admission of the testimony of the Commonwealth's expert witnesses, already referred to, and the offering in evidence of the paraffin mould of defendant's hand. We have already discussed the admissibility of this testimony. As to expert witnesses, Wigmore on Evidence, 2nd ed., Vol. 1, section 555, aptly says: "(3) . . . In a strict sense, every witness whosoever is an expert. In other words, the very fact that he is allowed to speak at all assumes that he is fitted to have knowledge on the subject; though in the vast majority of matters no demonstration of his fitness is needed." In the case at bar the Commonwealth's two expert witnesses qualified as having knowledge of the subject on which they expressed opinions. Defendant also called an expert witness, whose testimony is hereinbefore referred to. Both the Commonwealth and defendant were entitled to avail themselves of such testimony. These assignments are overruled.

The 18th assignment is based upon the refusal of the court to withdraw a juror and continue the case by reason of the following question asked defendant's daughter Bertha, on cross-examination: "Didn't you say to your Aunt Ella Winkler, after this shooting, 'Well, your father had wiggled out of all of the others, and he would get out of this too, and if he did you were afraid the same thing would happen to you?'" She answered: "I did not." The court said: "I am disposed to strike out the question and answer if counsel for defense desires it and then instruct the jury to disregard it." The record does not show that counsel for defendant made any such motion or request. This assignment is overruled.

The 19th and 21st assignments are based upon the court's permitting rebuttal of defendant's testimony on trivial and immaterial matters. They are overruled.

The 20th assignment is based upon the admission as rebuttal of testimony of John Sehar, husband of Sophie Sehar, tending to corroborate his wife's testimony as to her identification of Westwood as being at the scene of the homicide shortly after the shots were fired. In *Hester v. Com.*, 85 Pa. 139, this court held that where an attempt is made to discredit the statement of a witness, evidence is admissible to show that he had previously made a similar statement to other parties, not to show that the statement is true, but that it is not a fabrication of recent date. To the same effect is *Lyke v. Lehigh Valley Railroad Co.*, 236 Pa. 38, 84 A. 595. The subject of the admissibility of a previous statement of a witness consonant with his testimony at a trial is ably discussed by President Judge RICE in *Com. v. Kay*, 14 Pa. Superior Ct. 376. In that opinion he quotes Chief Justice GIBSON in *Craig v. Craig*, 5 R. 91, who adopted the rule of Starkie (1 Starkie's Ev. 187), "that consonant declarations may be given in contradiction of evidence tending to show that the testimony at the bar is a fabrication of a recent date; and to show that the same statement was made before its ultimate effect on the question trying could have been foreseen." See also *Com. v. Brown*, 23 Pa. Superior Ct. 470. This assignment is overruled.

The 22nd assignment of error is based upon the court's refusal to withdraw a juror and continue the case by reason of improper remarks of the assistant district attorney in his closing address. One of these improper remarks was withdrawn by the district attorney and the court instructed the jury to disregard it. It is also based upon the refusal of the court to withdraw a juror and continue the case because of the district attorney's remark in reference to a witness who had surprised the Commonwealth by a change in her story. He said in

his address to the jury: "Where is the perjury? Where is the subornation of perjury? It is with the defense." This statement on the part of the district attorney was objectionable, but the objection to it was made belatedly. See *Com. v. Weber*, 167 Pa. 153, 31 A. 481; *Com. v. Del Vaccio*, 299 Pa. 547, 149 A. 696. It is true that in some cases where the objectionable remarks amounted to gross impropriety and were highly prejudicial, this court has nullified verdicts "possibly based on prejudices rather than on facts," even though the objections to the improper remarks of counsel were untimely (see *Kelly v. Scranton Ry. Co.* 270 Pa. 77, 112 A. 748, and *Dannals v. Sylvania Twp.*, 255 Pa. 156, 99 A. 475), but the correct practice is for opposing counsel to call the court's attention to improper remarks "at the time they are uttered," as we said in the first case above cited and in many others. A motion to withdraw a juror and continue the case upon the ground of objectionable remarks of counsel is addressed to the sound discretion of the trial court and its refusal of the motion will be reversed only for palpable abuse of that discretion. There was no such abuse of discretion here and, besides, the trial judge carefully instructed the jury to disregard the offending remarks and to decide for themselves whether any witness was truthful or otherwise. This assignment is overruled.

The 23rd and 24th assignments relate to incidents when the jury was viewing the place where the homicide was committed, in the absence of the defendant. Assignment 23 is based upon a statement the trial judge made to the jury when it arrived at the scene of the crime, to the effect that if the jury wished to ask any questions, it might do so, and the trial judge would submit the questions to both counsel for defendant and the Commonwealth, and if no objection were made to having these questions answered, or to having "particular premises or parts" thereof pointed out, this would be allowed. Assignment 24 is based upon the fact that the trial

judge, conferring with counsel at the scene of the crime, said: "One of the jurors has asked whether, while we are here, the position of the woman in the room can be agreed upon." He then stated: "In response to the inquiry of one of the jurors, I am informed by counsel on both sides that the evidence will probably indicate that the person who committed the crime shot the victim through this window (indicating), the one to the left of these two, and the evidence will probably also indicate that, at the time of the shooting, the victim was lying with her head towards the left window, the left of the two windows we are facing." He then said: "Does that answer the question that has been asked me?" A juror answered: "Yes." The 25th assignment is based upon the alleged error that the visits to both the Westwood home and the Peyton roadhouse were not confined simply to a view, the assignment averring that "the defendant not having been permitted to accompany the jury on said view, was unable to confer with and instruct his counsel, or to personally object, thereby being deprived of his constitutional rights by reason of the matters and things set forth in the additional reasons for a new trial." The record shows that there was no objection made to the view or to any of the above stated remarks of the trial judge or to anything else said or done there.

It is established that no right of a defendant is violated when he is not present at a view of the premises where the alleged crime is committed. See *Com. v. Van Horn*, 188 Pa. 143, 41 A. 469. In that case this court held that the defendant was at liberty to attend the view if he choose to do so. In the case at bar the record does not disclose any request by the defendant to attend the view. The view was taken upon the motion of the district attorney and defense counsel said: We "have no objection." In *Com. v. Snyder*, 185 N. E. 376, the Supreme Judicial Court of Massachusetts held that "a view is not such a taking of evidence as violates the constitutional right of the defendant to meet the witnesses

against him face to face: 3 Wigmore on Evidence (2d Ed.), section 1803. . . . Defendant's contention that the refusal to grant the motion [that the defendant be allowed to be present at the view] is a violation of article XIV of the Amendments to the Constitution of the United States in that it is a denial of 'effective aid in the preparation and trial of a capital case,' and therefore is a denial of due process of law, citing *Powell v. Alabama*, 287 U. S. 45, 53 S. Ct. 55, is unsound, in that the chief purpose of a view is to enable the jury to understand better the testimony which has or may be introduced, and because the view is not a part of the trial, it being suspended while the view is taken." That case was appealed to the United States Supreme Court, 291 U. S. 97, and that tribunal, in an opinion by Mr. Justice CARDOZO, referring to the absence of a defendant during a view of the locus in quo, said: "If the risk of injustice to the prisoner is shadowy at its greatest, it ceased to be even a shadow when he admits that the jurors were brought to the right place and shown what it was right to see. That in substance is what happened here." Likewise in the case at bar, the jury was taken to the "right place" and had their attention concentrated on certain constituents of that place whose identification to them would enable them to visualize and understand the testimony they were about to hear. Since it was not error to point out to the jury the whole of the locus in quo, it was not error to point out any part or parts of that whole. The significance of what the jury saw depended entirely on the sworn testimony that related to the things seen. For the trial judge to have permitted any testimony to be received, or any discussion to be indulged in, or any argument to be made during the view, would have been improper. No testimony was received, no discussion indulged in, and no argument made during that view. Mr. Justice CARDOZO said further: "If it be true that there is no denial of due process as the result of a bare inspection in the absence of a defend-

ant, the question remains whether such a denial results where counsel are permitted, without any statement of the evidence, to point out particular features of the scene and to request the jury to observe them. The courts of Massachusetts hold that statements, thus restricted, are proper incidents of a view. . . . Since no witnesses are heard, there can be no comment or discussion: *Com. v. Dascalakis,* 246 Mass. 12; 140 N. E. 470." He referred to Massachusetts cases as upholding the regularity of such proceeding and declared that there is nothing in the 14th Amendment to the contrary. He said: "Obviously the difference between a view at which every one is silent and a view accompanied by a request to note this feature or another is one of degree, and nothing more. The mere bringing of a jury to a particular place, whether a building or a room or a wall with a bullet hole, is in effect a statement that this is the place which was the scene of the offense, and a request to examine it. When the tacit directions are made explicit, the defendant is not wronged unless the supplement of words so transforms the quality of the procedure that injustice will be done if the defendant is kept away. Statements to the jury pointing out the specific objects to be noted have been a traditional accompaniment of a view for about two centuries, if not longer. The Fourteenth Amendment has not displaced the procedure of the ages. . . . We may assume that the knowledge derived from an inspection of the scene may be characterized as evidence. Even if this be so, a view is not a 'trial' nor any part of a trial in the sense in which a trial was understood at common law. This is seen from two circumstances. In the first place the judge is not required to be present at a view, though he may go there if he will. In the second place, the practice for many years was to have a committee of the jurors, the usual number being six, attend at the view to represent the whole body. See the rules laid down by Lord MANSFIELD in 1 Burr. Rep. 252; also the provisions

of the Act of 6 George IV, c. 50, sections 23, 24 [1825], by which the practice was made uniform in criminal and civil cases; and compare Wigmore, Evidence, vol. 2, section 1165, and the cases cited. We have no thought to suggest that a view by a part of a jury is permissible to-day. That question is not before us. There is significance, none the less, in the fact that it was permissible in England, the home of the principle that a defendant charged with felony has the privilege of confronting his accusers and of being present at his trial. . . . To transfer to a view the constitutional privileges applicable to a trial is to be forgetful of our history."

In the instant case the view was (as to avoid the imputation of irregularity a view must be) *an inspection only,* not an occasion for the taking of testimony or a discussion among the jurors or by any of them with any other person, of any phase of the case. The jurors' vision was directed by the trial judge himself to certain things at the locus in quo so that their comprehension might be aided when testimony relating to those things should be given at the trial. This the trial judge or an officer in charge of the jury if so directed by him, had a right to do. Legal error was further guarded against by the placing on the record of defendant's counsel's acquiescence in this procedure. If the defendant had been personally present, there was nothing said or done at the view to which he could have made a sustainable objection. See *Com. v. Kosh,* 305 Pa. 146, 157 A. 479, and *People v. Thorn,* 156 N. Y. 286, 50 N. E. 947, 42 L. R. A. 368. The 23rd, 24th and 25th assignments are overruled.

The 26th assignment of error is based upon the refusal of the court to withdraw a juror and continue the case by reason of the fact that one of the jurors made a motion, while looking at some person in the court room, by crossing his nose with his right hand and drawing his right hand across his throat. As the significance of this gesture is a matter of personal opinion, no fault can be

found with the trial judge in refusing counsel's motion based upon it. The court said: "I saw nothing of any sort myself. All we can do is observe the jury as much as possible. If we see an untoward conduct on the part of the jury, we will take note of it, but we have not observed any." This assignment is overruled.

The 27th and last assignment of error is based upon the refusal of the court to further instruct the jury, in response to the following written note received from the jury after the case had been committed to it: "Some of the jury have lost track as to whether any testimony was given as to defendant's appearance at Peyton's between 1:25 and 1:43 on the night bearing on the case." The court replied: "It is your recollection of the testimony which must control. I can be of no assistance to you on the subject." If the jury had desired any portion of the testimony read, it should have made such a request to the trial judge. After this note had been received the court said to defendant's counsel: "As I understand you, you are not asking me to bring the jury back into the box and to say in open court that I cannot be of assistance to them." Counsel answered: "No." The court: "Then, it is only a question of whether I should bring the jury back and call their attention to what you recall in the testimony of the defense that the defendant was dressed in light clothes out at Eddie Peyton's. We do not consider that it is within the province of the trial judge to call their attention, in reply to their inquiry, to the matter referred to by counsel for the defense, and we must therefore refuse the request." In the action that the court took there was no abuse of discretion. This assignment is overruled.

In a painstaking examination of this voluminous record, we have found no reversible error. The evidence sustains the jury's conclusion that the appellant perpetrated this shocking crime. Had the highest permissible penalty been imposed, an appeal for its reduction to the lesser penalty now complained of would have found this

record barren of a single mitigating fact for its support.

The judgment is affirmed. The record is remitted to the court below that sentence may be carried out.