Commonwealth *v.* Bovaird, Appellant.

Argued September 24, 1951.   Before RHODES, P. J.,
HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.
(GUNTHER, J., absent).

*Charles J. Margiotti,* with him *J. J. McDowell, Mc-
Dowell & McDowell, Vincent M. Casey, Margiotti &
Casey,* and *Casey, Power & Savage,* for appellant.

*William P. McVay,* Deputy District Attorney, for appellee.

OPINION BY DITHRICH, J., November 15, 1951:

Defendant was convicted and sentenced on six indictments, four charging fraudulent conversion and two embezzlement. The charges of fraudulent conversion were brought under §834 of The Penal Code of 1939, 18 PS §4834, and those of embezzlement under §824 of the Code, 18 PS §4824.

At the close of the testimony defendant moved for a directed verdict for the reason that the Commonwealth had not made out a prima facie case; that the indictments for fraudulent conversion were "repugnant" with those for embezzlement; and that the Commonwealth had not charged nor proved a crime as set forth in the sections of The Penal Code under which the indictments were drawn. The motion was overruled, and after the jury had found defendant guilty as indicted the same questions were raised in motions in arrest of judgment and for a new trial. They were likewise overruled and this appeal followed.

On July 27, 1934, an agreement, headed with the notation "Cotenancy Agreement", was entered into by defendant and his then wife, Margaret C. Bovaird, and John J. Carter and his wife, Beth M. Carter (now Beth M. Putnam), the prosecutrix. The agreement was drawn up by attorney John K. Bovaird, a brother of defendant. It recited in part that the parties had formed a "cotenancy" to be known as Carter & Company (hereinafter referred to as the Company) for the purpose of acquiring and operating for petroleum and natural gas certain properties or tracts of land in McKean County, Pa. The proportionate share of each of said "cotenants" was a one-fourth interest. Defendant, who described himself as a "better than average operator," in testifying as to what "led up" to the forma-

tion of the Company, said that there were "only two reasons for Beth going in[to] the oil business. One was for profit and the other was based on friendship." He said: "Beth had two boy friends. She asked me which one to marry and I selected John Carter. . . . They were married . . . in May and when they came back to Bradford *I didn't seek Beth out."* (Emphasis added.) Nobody having said that he did, was that the spontaneous statement of an innocent man or did it bespeak a guilty mind? Cf. *Commonwealth v. Westwood*, 324 Pa. 289, 188 A. 304. He continued: "My wife said, 'How would you like to go into the oil business? Geordie [that is, defendant] has a very excellent property.' She said, 'We will even let you in on it. We will give it to you as a wedding present.' " Mrs. Carter was "let in on it" to the extent of $67,500, her initial "installment" of $30,000 being followed by subsequent "installments" of $27,500 and $10,000 each. That was her "wedding present" from the Bovairds.

The agreement provided further that Bovaird would "in all respects . . . manage, control and operate said property with as full and ample authority and unrestricted power as if he were the sole owner thereof . . . and for this service" he was to "be paid the sum of two hundred dollars monthly [later increased to $250]." Carter was "entitled, at any time he . . . [might] so desire, to work for Carter & Company" and he did so work later on "at the stipulated sum of two hundred dollars per month [likewise increased to $250], under the direction of the Agent, the aforementioned George Bovaird, Jr."

As "Agent" Bovaird was to receive and "deposit . . . to a special company account, all moneys . . . realized from oil sales . . ., and to issue checks thereon." The defendant collected the oil runs and was billed for the production costs.

Later, marital differences having arisen between the Carters, Mrs. Carter obtained a divorce and took from her husband an assignment of his one-fourth interest in the Company, and upon the death of defendant's first wife her interest vested in her son, George Christie Bovaird, with his father as trustee. For the period ending December 31, 1949, the books showed an overdraft in the capital account of defendant of $196,704.28; his account as trustee for his son showed a credit balance of $46,345.32, and the account of Mrs. Putnam showed a balance in her favor of $127,690.67, that being her distributive share of the earnings to that date. She had received "advances" totaling $9,500. There were judgment liens against the property of $300,000.

The indictments at Nos. 17, 18, 19 and 29 each relate to a separate transaction, but in substance they are the same. They charged that defendant being "an agent of Carter and Company and as such agent being entrusted for the safe custody of the monies, accounts and properties of said Carter and Company, did . . . fraudulently, unlawfully and feloniously withhold, convert and appropriate to his own use" a certain sum of money "being the funds of Carter and Company, by drawing a check of Carter and Company . . . on the account of said company in the Citizens National Bank of Bradford payable to . . . [himself], and thereafter . . . using the proceeds of said check for his own use and benefit."

Section 834 of the Code (18 PS §4834) provides in part that: "Whoever, having received or having possession, *in any capacity or by any means or manner,* of any money or property, of any kind whatsoever, of or belonging to any other person, or which any other person is entitled to receive and have, fraudulently withholds, converts, or applies the same, or any part thereof, or the proceeds or any part of the proceeds,

derived from the sale or other disposition thereof, to and for his own use and benefit, or to and for the use and benefit of any other person, is guilty of a felony . . ." (Emphasis added.) The section is a re-enactment of the Act of May 18, 1917, P. L. 241.

In *Commonwealth v. Gartman*, 83 Pa. Superior Ct. 108, 111, this Court said: "It was the evident intention of the legislature in the adoption of the Act of 1917 to provide for cases not specifically included in any of the previous legislation on the subject of embezzlement." In *Pearl Assurance Co. v. National Insurance Agency, Inc.*, 151 Pa. Superior Ct. 146, 152, 30 A. 2d 333, 336, the Court said: "It [Act of May 18, 1917, P. L. 241] was designed to cover those border line cases between embezzlement and larceny by bailee, where the faithless agent or custodian sometimes escaped his just deserts on the ground that his actions were only a breach of trust for which he was not responsible by criminal prosecution, or even by civil action except in assumpsit."

As stated in the opinion of the lower court, "The language of this statute is quite sweeping. *'In any capacity or by any means or manner,'* may be taken to indicate that the section is intended to be quite inclusive." In *Commonwealth v. Schuster*, 158 Pa. Superior Ct. 164, 167, 44 A. 2d 303, 305, we said: "The prosecution is properly brought against one who has received property *in any capacity* and afterwards fraudulently misapplies it, even though an indictment for a different statutory offense would have been proper under the circumstances." (Emphasis added.) And in *Commonwealth v. Cavanaugh*, 159 Pa. Superior Ct. 113, 116, 46 A. 2d 579, 581, we said: "Under the Penal Code (Act of June 24, 1939, P. L. 872, §834, 18 PS 4834) proof of receiving money or property 'in any capacity or by any means or manner' will support the charge [of fraudulent conversion], if fraudulently withheld from

the owner." See also *Commonwealth v. Shutts,* 163 Pa. Superior Ct. 415, 62 A. 2d 82. The learned president judge of the court below, after commenting on the fact that there were no decisions in this State definitely disposing of the "precise question in dispute," said: "We may be justified in concluding that the words above quoted are all inclusive and intended to apply to cotenants as well as others."

The indictments at Nos. 31 and 33 charged that defendant "being . . . an agent of Carter and Company and as such agent being entrusted for safe custody of the money, accounts and properties belonging to Carter and Company, of which Beth M. Putnam was entitled to have a one-half share of interest . . ., did unlawfully, fraudulently and feloniously take, convert and apply to his own use" a certain sum of money, "said money being the property of Carter and Company."

Section 824 of the Code (18 PS §4824) provides in part that: "Whoever, being a banker, broker, attorney, merchant or agent, and being intrusted, for safe custody, with the property of any other person, and, with intent to defraud, sells, negotiates, transfers, pledges, or in any manner converts or appropriates to or for his own use or the use of any other person, such property, or any part thereof, is guilty of embezzlement, a felony . . ." The section is a substantial re-enactment of §114 of the Act of March 31, 1860, P. L. 382 (18 PS §2481).

Appellant is right in his contention that under certain circumstances, depending upon the relationship between the parties, it is necessary in charging the crime of embezzlement under this section that the nature of the relationship between the parties be specifically set forth. But that would have no application under the circumstances of this case. The cotenancy agreement clearly sets forth the relationship between

the parties and makes the defendant the agent of the Company for the purpose of receiving credit for all the oil runs; for receiving and depositing all the money realized from the oil sales; for depositing the same and issuing checks thereon. Cf. *Commonwealth v. Lettieri,* 63 Pa. Superior Ct. 532. The indictments were drawn in the language of the Act. The nature of the transaction between the parties and the purpose of the trust were clearly set forth in the agreement which was put in evidence at the trial. The indictments were not defective in not setting forth facts which could be and which were proved at the trial.

In answer to appellant's contention that the indictments for fraudulent conversion were "repugnant" with those for embezzlement, it is sufficient to point out that each indictment relates to a separate and distinct transaction and, furthermore, that §834 specifically provides that "The offense specified in this section may be joined in the same bill of indictment with any other felony or misdemeanor arising out of the same transaction, and there may be included in the same indictment as many counts as there are separate and distinct misdemeanors hereunder committed against the same person." Since each of the offenses could have been covered in a single indictment containing two counts, one charging a violation of §824 and the other a violation of §834, the indictments were not "repugnant" nor was defendant prejudiced in any way by having the charges laid in separate indictments.

Paragraph 5 of the agreement provides in substance that, upon complete payment of all obligations of the Company incurred in the course of operating the said properties and "reimbursement of initial installment and other advances by the aforesaid cotenants," Bovaird should thereafter remit to the several cotenants their proportionate shares of the net profits of said business and at any and all times exhibit to the several

cotenants "his books of account in which his receipts and disbursements shall be regularly entered." He takes the position that his withdrawals and disbursements were not in violation of the law or the agreement since they were "kept on the books." When asked whether he did not withdraw $235,000 from the Company funds, he answered: "Yes, sir, I did. It is on the books. I made sure that it was there as Beth requested. 'Just be sure it is kept on the books so that it can be adjusted at some later date.'" He later corrected his testimony to say that the sum withdrawn was not $235,000 but $196,000 and some odd dollars. Counsel flatly contends that appellant could withdraw upwards of $196,000 of the funds of the cotenancy for his own use and be guilty of no crime, since he was part owner of the funds. But as stated by the learned president judge of the court below: "Commonwealth contends that defendant's ownership of the funds, as a cotenant, would commence only after payment of the indebtedness of the cotenancy, he being the agent of the cotenancy, under the terms of the agreement. Since there were amounts owing to the prosecutrix and other obligations of the company, it may be considered that what defendant had was not *ownership* of the funds of the company in his hands, but simply an *interest* therein." Based on Paragraph 5 of the agreement, that contention appears to have been properly upheld. No matter how persuasively it may be argued that the "Cotenancy Agreement" provides a convenient loophole for escaping all criminal liability for fraudulently converting or embezzling the funds of the cotenancy, we are far from being convinced that it provides an effective method for evading the clear intent of the law in such cases made and provided.

Since the reasons assigned in support of defendant's motion for a new trial are substantially the reasons advanced in the motion in arrest of judgment, we will

not unduly prolong this opinion by discussing them, for to do so would be for the most part repetition.

One important question, however, still remains to be disposed of. Robert B. Apple, a member of the Bar of McKean County, had in 1948 caused a judgment to be confessed against appellant and in favor of Mrs. Putnam which included an attorney's commission of $1,500. Apple was appointed a deputy district attorney September 30, 1950, due to the illness of the regularly elected district attorney. As a deputy district attorney he appeared before the grand jury which returned the indictments on which defendant was tried. In support of his motion to quash the indictments, defendant argued that "There was no necessity for the appointment of an assistant district attorney or deputy district attorney as a special prosecutor in this case." We agree that there was no necessity for the appointment of a special prosecutor; but we do not agree that there was no necessity for the appointment of a deputy district attorney. On petition of the district attorney, stating that as a result of a serious illness he was unable to discharge the duties of his office, the court appointed Apple as a deputy district attorney "to represent the Commonwealth before the grand and petit juries, during the October Sessions, 1950, . . . said appointment to expire with the October term of court." The appointment was strictly in accordance with the provision of article III, §260 of the Act of May 2, 1929, P. L. 1278, 16 PS §260, which provides: "In any case where there is no regularly appointed assistant district attorney, if in case of sickness or from any other cause the district attorney shall be unable to attend to the duties and business of the term of a court, he may appoint some competent attorney of the county, with the approbation of the court, to act as his deputy for one term, but for no longer period." Since the appointment was in strict compliance with the statute, it is not nec-

essary for us to consider the inherent power of the court to designate such assistant or deputy district attorney to carry out the duties of the office of the district attorney as circumstances shall require for the purpose of furthering the proper administration of justice.

As to the charge that Apple was incompetent to serve as a deputy district attorney because the confession of judgment at No. 214 October Term, 1946, in the Court of Common Pleas of McKean County, included an attorney's commission of $1,500, suffice it that "This commission does not belong to the attorney, but to the creditor." *Commonwealth v. Pennsylvania Loan Corporation*, 127 Pa. Superior Ct. 253, 256, 193 A. 141, 143.

The judgments are affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with his sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.