## Commonwealth *v.* McCarter, Appellant.

Argued April 16, 1956. Before STERN, C. J., JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*William A. Sykes,* with him *John E. Aikman,* for appellant.

*William J. McKnight,* District Attorney, with him *George H. Kurtz,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 21, 1956:

The tragedy upon which the criminal prosecution in this case is based began with romance. In 1929 the defendant, Robert E. McCarter, then age 19, became enamored of his high school teacher. He paid her rapt attention until graduation, courted her for three years after he had left school halls behind him, and then in 1933 took her to New York where he married her in the storied Little Church Around the Corner. Somewhat of an idler by disposition, he only worked at irregular intervals, but his indolence did not diminish his capacity for enjoyment, since his wife, who was ten years his senior, was able, through her savings, to bring bread to their common table, though he often spread it with the mustard of infidelity. Among the many gifts she showered upon him was a shotgun as he was quite fond of hunting. On December 8, 1954, Robert turned this same shotgun on his wife-benefactress and blasted her into eternity.

He was indicted for murder, the jury returned a verdict of manslaughter, and he has appealed to this Court for a new trial. The defendant complains that the trial judge should have directed a verdict of not guilty. A careful reading of the record of 900 typewritten pages reveals that not only would such an instruction have perpetrated a gross miscarriage of justice, but that the jury could have properly returned a verdict of murder in the first degree. The dovetailing story which was presented through 50 witnesses sup-

ports and almost impels the inference that the defendant had tired of his wife and wished with the scythe of death to sever the conjugal knot which bound him to moral standards which were galling to his undisciplined character.

In July, 1953, the defendant entered into a meretricious relationship with one Harriet Messmore. He lived with her, travelled with her in an auto trailer, deposited money in a joint checking account with her, designating her as "Mrs. Harriet McCarter", and finally even went through a simulated wedding ceremony with her. He wrote letters to her in which he said, inter alia: "Just one month ago today we declared to the world, or rather our world, we were that way. Sure hope soon we can be together for always."

"Sure need you but won't be long until I will have all of you."

"I have just got to be with you. Never again, if we can possibly help it, will we be separated like this —everybody can go to hell first. Our life together means too much to me."

At the trial Miss Messmore testified against the defendant, relating some of the disreputable details of their illicit union. She told how he represented to her that he was seeking a divorce from his wife and how on the eve of their spurious marriage he said to her that the divorce against his legitimate wife had become final.

McCarter also confided to one of his companions, one Floyd Hixon, that he intended to divorce his wife because of the difference in their ages.

On the day of the fatal shooting the defendant and his wife were at their home alone. Only McCarter, therefore, was available for testimony as to what actually occurred. He testified that he got up at 10 o'clock, prepared breakfast, idled through the hours, dawdled

over an amateurish so-called Craft "painting," studied a grocery list with his wife, discussed with her some supposed business enterprise, and generally engaged in what seems to have been rather innocuous and purposeless talk. This conversation took place in their bedroom on the second floor. He testified further, getting down to the crucial event of the day, that in the late afternoon as he was leaving the bedroom, his wife threw a coat hanger at him. He descended to the first floor, obtained his shotgun which he had left in a cupboard, opened the back door and fired two shots. He explained this act as follows: "Well, I was a little angry and I picked the gun back up and I thought, 'Well, I'll just shoot two shots out the back door and scare Mary; I'll make her sorry for me or something.' I broke the gun open and it was loaded. I snapped it shut and put it back together and opened the back door and fired two shots up over the bank."

He then reloaded the weapon, reascended to the bedroom and rested the gun against the bed. His wife now, according to the defendant's narrative, began to censure him and he started out of the bedroom. She followed him, clawing at his face. At this point the shotgun went off. The defendant stated he heard only one shot, but the facts conclusively establish that both barrels were fired. When the smoke cleared, Mrs. McCarter was lying on the floor with her lower jaw shot away. Of the 438 pellets in a shotgun shell, 350 of them landed in her face and upper arm. She died several hours later. The defendant sustained a superficial neck wound.

McCarter's explanation of the shooting is that the gun discharged accidentally. As fortuitous a happening as an accident is, it still is controlled by the forces of natural phenomena. A ballistics expert testified that the gun was a well-made, sturdy weapon and could

not have been discharged except by trigger movement. In tests which were made it was demonstrated that even when dropped from a height of two feet on to a concrete floor, the gun failed to discharge. The condition of the room after the shooting, the size and location of the pools of blood, the lodgment of leaden pellets in the ceiling of the room, and the posture of the victim's body were circumstances which led deductively to the conclusion that the defendant fired both barrels of the gun.

Although at the trial McCarter's entire defense was based on the proposition that the gun released its lethal load of shot without human intervention, his explanations prior to the trial produced a different picture. A couple of hours following the shooting, Chief of Police Geist asked the defendant how the gun had been discharged and the defendant replied: "How the hell does any gun go off, you pull the trigger." When Corporal Steiner of the State Police asked him who pulled the trigger, the defendant replied: "I must have, I had the gun."

The defendant's story that prior to the fatal shooting he fired two shots from the back door seems to be sheer fiction. There is no evidence to substantiate this assertion and it is hard to believe that if the shots had been fired the police would not have located some neighbor who had heard the unusual noise. Several did testify that they heard the two shots (and only two) which occurred at the time of the actual homicide. It could well be that the tale of the first two shots was invented by the defendant to give substance to his later statement that his wife had abused him and thus offer verisimilitude to the claim that she attempted to "claw" him as he left the bedroom. In any event, his own story that he was smarting under an assumed hurt bolsters rather than diminishes the strength of the prosecution's

theory that he was intent on taking her life or at least doing her serious bodily harm.

As already stated, some 50 witnesses testified at the trial which was well presented on both sides of the counsel table. Although the Commonwealth pressed vigorously for a conviction, there is no indication that it adopted unfair methods or sought to deprive the defendant of the fullest opportunity to free himself from the web of accusatory circumstances in which he entangled himself by his own actions and words. Three lawyers protected the defendant's interests and the case was fairly presented to a jury which had been carefully chosen. In its opinion refusing a new trial, the lower Court said: "In the drawing of a jury one hundred four (104) prospective jurors were examined over a period of three and one-half days. When the regular panel of jurors had been exhausted, the Court, at the request of defense counsel, directed the Sheriff in the summoning of an additional venire, to select them from the southern part of the County away from the vicinity where the defendant and his deceased wife had resided, thereby assuring to the defendant a trial by an impartial jury."

Counsel for the defendant have urged twelve reasons for a new trial. We have superimposed these reasons over the transcript of the record and do not find that collectively or individually they point up any error which would justify a retrial of this case. In abbreviated form we will enumerate the reasons advanced by counsel and briefly state why they are being rejected.

1. The defendant contends that the Commonwealth should have turned over to him the official reports made by the Pennsylvania State Police. The record shows that the Court granted defense counsel permission (of which they did not avail themselves) to ex-

amine the original notes taken by the State Police officer when he interviewed the defendant.

2. Defense counsel urge that the defendant was entitled to a daily transcript of the record. The lower Court said of this: "A tape recorder, operated by the official court stenographer, was in operation during the entire trial and defendant could have reviewed any part or all of any day's testimony, either by his attorney or by any proposed expert witness he might wish to place on the stand."

3. The defendant complains that the District Attorney, in cross-examination, put to him improper questions. The transcript shows that the questions were in order and fell entirely within the range of permissible cross-examination.

4. Counsel claims error in this quoted portion of the Trial Judge's charge: "What the attorneys may have said was their version of the testimony in their summations of the case to you. You will disregard it . . ."

The remainder of the sentence reads: "and take the testimony as you recall it from the lips of the witnesses as they appeared here on the stand." The statement of the Judge, isolated from context, is not blemishless. Jurors are not to disregard the summations of the attorneys. What the Judge obviously intended to say was that the jury is not *bound* by the attorneys' recollection of the testimony. The Trial Judge did make this clear in succeeding sentences and, as a whole, his charge was correct.

5. Under all the circumstances it was not error for the Court to refuse to declare a mistrial when the Commonwealth offered to introduce a tape recording, which was then in fact not introduced.

6. The Court did not err in admitting statements against interests made by the defendant, nor in charging the jury on those statements.

7 and 9. While photographs, black-and-white or colored, of deceased bodies should not be displayed except where they serve some evidentiary purpose, we do not find that photographs were here used improperly.

8. Nor was there any error in admitting evidence of an autopsy.

10. It was in order for the Commonwealth to submit in evidence the letters written by the defendant to his paramour. In *Commonwealth v. Westwood*, 324 Pa. 289, 304, we said: "It is well settled that 'where the victim of crime is the spouse of the accused, evidence tending to show want of affection upon the part of the accused or infatuation with another, is admissible on the question of motive': 30 C.J., section 409, page 185."

11. And, for the reason just given, it was not error to receive other evidence with regard to the meretricious relationship between the defendant and his paramour.

12. We find no merit in the defendant's claim that the Trial Court erred in its charge to the jury in refusing to direct a verdict for defendant, in its instructions on the defense of accidental shooting, and in his charge on the evidence of the relationship between the defendant and his paramour.

Defendant's counsel have prepared an able and exhaustive brief, but in its thoroughness it only reveals all the more vividly the good fortune which brought their client through the rigorous test of a trial with a verdict of voluntary manslaughter instead of murder in the first degree.

Judgment affirmed.