THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MERCEDES SÁNCHEZ PARRA, Defendant and Appellant.

No. 7013. Argued May 18, 1939.—Decided July 19, 1939.

*Arturo Aponte, Angel M. Villamil* and *Benjamín Ortiz,* for the appellant. *R. A. Gómez, Prosecuting Attorney,* for The People, appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Mercedes Sánchez Parra was accused of a crime of murder. When the case was called for trial and before the jury was impanelled the district attorney reduced the degree of the crime to murder in the second degree. The jury found her guilty of voluntary manslaughter. She requested a new trial and it was denied. She was sentenced to six years in prison at hard labor. She appealed from the sentence and from the ruling denying a new trial to this Court.

In her brief she alleges that the district court committed six errors, to wit:

"1. The district court erred in permitting a witness to testify as to the so called paraffin test against the objection and exception of the accused.

"2. The district court erred in permitting an expert to testify that deceased had not been in contact with a firearm.

"3. The District Court of San Juan erred in not setting aside the verdict of the jury as being contrary to law and the evidence and in refusing for that reason to grant the accused a new trial.

"4. The District Court of San Juan erred in ignoring the theory of suicide in its instructions to the jury and in disregarding the avoidances contained in the written declaration of the accused which was presented in evidence by the district attorney.

"5. The District Court of San Juan erred in giving instructions as to Homicide in this case and in disregarding the different degrees of the crime, the error having served as a compromise or means of convicting the accused in any way by the jury.

"6. The District Court of San Juan erred in refusing to give the second special instruction requested by the defense."

The errors alleged by the appellant are so closely interrelated to the evidence that in order that the discussion which we are going to make of each of them be better understood,

we will begin with a narration of the evidence which served as a basis for the instructions of the court and for the verdict of the jury.

In the early morning of December 22, 1935, the corpse of Salvador Planadeball was found on the beach in the Condado, Santurce. He appeared to be lying against a rock with one leg drawn up and the other stretched out as though he were resting there, with his head slightly inclined towards the right. He had a bullet wound in the right parietal region and a burn on his hand. His hat was on the ground, face down, and no weapon or shell was found anywhere near him. He was dressed in white and his clothes as well as his hat were damp as a result of the rain that fell in the early morning of that day. The bullet wound did not show any powder marks nor any evidence of having been in contact with the powder smoke. The hat on the other hand showed evidence of the shot and had particles of powder, which upon being examined proved to be black powder, which according to the experts is the most common. Taking into consideration that it might have been suicide, the corpse was removed to a clinic and its hands were subjected to the paraffin test by Eleuterio Hernández, one of the experts of the Criminal Investigation Department. The paraffin test gave a negative result on both hands, which was shown by the absence of nitrates on the corpse's hands, and therefore indicated the possibility that the death dealing weapon had been fired by someone else, and decreased the possibilities of suicide.

From the evidence it appears that on December 21, 1935, the deceased and the accused visited the house of Marcia Corretger, a friend of the accused, who lived in Delicias St. in Santurce, at about 10:00 o'clock in the morning. On that day the birthday of Carmen Baldorioty, Marcia's daughter, was being celebrated, and they were invited to lunch. They accepted and left to return at lunch time. At about 12:00 o'clock noon he arrived and shortly thereafter she arrived. They had quarreled and although they sat down to lunch

they ate nothing. The accused threw cigarette ashes in deceased's plate. She was very annoyed because during the morning of that day she had found him talking to a woman in the "Wonder Bar" and he did not go to her immediately. He told her to stop being childish that that was the wife of a friend of his who visited his home, and she answered that she, the accused "came first". Another reason for their quarrel was that the accused insisted that the deceased should get a divorce so that they could then go to live together to the United States after she also had gotten a divorce and deceased answered her that he was not willing to get a divorce because his wife was a good woman and had given him no reason for divorce and that he did not want to abandon his children. The accused later returned to San Juan and in front of the Bouret Building she met Carmen Baldorioty and Modesta Ríos, the latter a nurse who also lived in Marcia Corretger's house. She invited them to accompany her to deceased's office at the Bouret Building where she had to pick up a letter. The three of them went up to the office. Deceased was not there. Accused went to his desk and from it took a piece of paper which was later offered in evidence and on it wrote: "Planas, I love you. If you are mine or not let me know. Always yours up to the hilt." On the reverse of the paper she wrote: "Always yours up to the hilt." She stuck this paper on the wall with a pin and after doing this she spilt the ink well on the desk, disconnected the telephone and took a brief case containing some documents and left with her friends. They went to "The Aquarium" and from there left in an automobile together to Marcia Corretger's house, arriving there at about 6:00 o'clock in the afternoon. They found Planadeball sleeping on Marcia's bed and the accused made him get up telling him that she was leaving for Ponce. They remained nevertheless for a while in the house and when dusk was falling, on invitation of the accused she and deceased left on foot towards the Condado. Three witnesses who were in

the neighborhood of the building of the Club Afda, then being constructed, testified that they saw a man and a woman pass in the direction of the beach of the Condado. The woman was walking rapidly and a man followed her about a yard behind. That on arriving at a certain place, the woman ran and the man continued following her. Some of these witnesses were able to notice that she had on a dark dress and he a light suit. They could not distinguish their faces because it was already quite dark. That both were lost to sight in the darkness of the beach. One of the witnesses after he could no longer see them in the darkness saw what appeared to him to be the light of a cigarette which sometime later was extinguished. Later, they all heard a loud noise but none of them suspected it to be a shot because in those days, close to Christmas, the kids were in the habit of shooting off firecrackers and they thought that was what it was. One of the witnesses, the housekeeper of Mr. Adrián Pérez who lived on Nereidas Avenue in front of an empty lot which extends up to the sea was putting the children to bed when she heard the noise. She went out to the balcony and saw a woman running from the beach alone. She continued watching her and when the woman came to the corner of Condado and Nereidas Streets in front of Mr. Domenech's house, and by the light of the street lamp she saw that the woman was dressed in a navy blue dress that she was carrying a pocket book and that she wore a hat with a black ribbon.

Marcia Corretger testified that on that night, December 21, the accused came to her house and told her that Planadeball had killed himself. That the accused had a suit case in witness' house and that she changed her dress which she had on, which was navy blue, and gave it to her saying: "I leave you that, cut it up, burn it or do what you want with it." The witness Modesta Rivas also testified that at that time she was preparing her bed to retire and that upon

hearing people she went down and found that it was the accused, that the following dialogue ensued between them:

"My dear, you here? I thought you were far from here already.

"My dear, don't metion it, Planas has killed himself. When they come to ask questions here say that you don't know nothing, that you have not seen me. (T. of E. page 229).

The same witness asked her how Planadeball had killed himself since she had seen him in the afternoon when he had no weapon and the accused answered:

"I had his revolver and in the afternoon he began to tell me to lend it to him and finally he said: 'Lend me the revolver.'"

That she had not wanted to lend it to him but that he bothered her so much that she gave it to him, he stuck it in his pocket and then said: "Look what you have done." The witness also testified that the accused took the revolver in her hand and stuck it in her pocketbook. That it was on the floor and when they were talking she took it and put it in her pocketbook, but first she cleaned it with her hand; that the only person who was in the room at that moment was Marcia Corretger, who was in bed. The witness also testified that when the accused told her that Planadeball had killed himself she asked her why did she not call a hospital because he might be still alive and that the accused answered that he was dead, that she knew because she had touched him, and she said: "Leave him alone, don't go making a fool of yourself, don't call any place." At this moment an automobile arrived at the house with a friend of the witness. The witness asked the accused if she wanted her and her friend to take her to the house where she was stopping and the accused answered no, that as the witness was going out, when she passed by stop 15 she should send a car to get her. From Marcia Corretger's house the accused went that night to the house of Amelia Bithorn, in the Condado. She slept there and during the night she asked Mrs. Bithorn's husband to get her an automobile to go to Ponce, leaving at seven o'clock in the morning of December 22nd for that city.

The testimony of the Chief of Detectives Mr. Lloréns is of great importance in clearing up the facts. He describes in the first place the position in which he found the corpse when he was notified at 7:30 in the morning by telephone. He searched it and found no weapons. He later explains the different investigations which he carried out, especially in deceased's office, corroborating the testimony of Modesta Rivas and Carmen Baldorioty, as to the state of disorder in which the accused left the desk. He testified that he found there a box of letters addressed to deceased and signed "Merce", and what is more important, he describes the interview he had on Monday the 23rd with the accused, first at Mr. Gotay's office and later at the office of the Insular Police Commission. In this respect Mr. Lloréns testified that in answer to a telephone call he went to Mr. Gotay's office, of the newspaper J'Accuse, and there found the accused. She told him that she was ready to go wherever he wanted. In the presence of the accused Mr. Gotay told him that she had come from Ponce to give herself up because she knew they were looking for her and she wanted to avoid being arrested in Ponce and thereby prejudicing her family's reputation. With regard to the deceased, the accused told him that she had had a quarrel with him in San Juan, that it continued at Marcia Corretger's house, and that on the night of the 21st, she had gone for a walk with him on the beach. There they had another quarrel because she was going on a trip to the United States and wanted him to get a divorce. That he did not agree and in disgust she stood up and told him that their relations were over. That when she had gone a few steps she heard a shot and returned to him believing that he had done it so that she would not leave. That she examined the corpse and observed that it was bleeding "on the right side", *and understanding that he was dead, she looked all around for the revolver and did not find it.* That she wanted to find it

to commit suicide and upon not finding it she returned to Marcia Corretger's house to pick up something that she had there. That she then went to Mr. Mejías's (the husband of the witness Amelia Bithorn) house, near the Presbyterian Hospital, where she spent the night. That early in the mornig she left for Ponce and visited her uncle, who is an attorney, at Dr. Pila's clinic. That upon telling him of what had happened, her uncle told her that she should expect to be arrested at any moment and that this decided her trip to San Juan.

The district attorney presented in evidence the declaration given by the accused before him on the night of December 23, 1935. After having been warned by him of her right not to testify, and that if she did the testimony could be used against her, and after the accused had assured him that her testimony was spontaneous, that she had not been offered anything, nor threatened in any way, she then proceeded to describe what happened on the beach in the following manner:

"D. A.   Well, then, be kind enough to explain what you wish.

"A.   We had an engagement to go to 'La Mallorquina' to have supper.

"D. A.   Planas and you?

"A.   Yes.

"D. A.   Continue.

"A.   And then we were thinking of going for a while to the Escambrón, but it became late for him.

"D. A.   Became late for him?

"A.   Yes.

"D. A.   What did you do then?

"A.   We went for a walk in the Condado section.

"D. A.   Where did you go?

"A.   I do not remember exactly.   I know that we walked around for a while on foot.

"D. A.   Continue.

"A.   Then he invited me to go to the beach and we went there and I sat down and he continued standing, and then we talked about several things there.

"D. A. About what did you talk?

"A. Of a trip that I intended to take to New York.

"D. A. Did you intend to go on that trip alone or with him?

"A. Alone, my purpose was to spend a couple of winter months there.

"D. A. Continue.

"A. He then asked me when was I going and I told him: 'The first week in January.' And he said that he could not let me go alone, that we had to decide our situation.

"D. A. What situation?

"A. Our situation.

"D. A. What was that situation?

"A. The fact that we were both married.

"D. A. Continue.

"A. We talked and he asked me: 'Is that your decision?' and I told him: 'Yes, I am going the first week in January', because he wanted to go towards the end of January for he had some matters to attend to first. Because he wanted us to stay up there for the time being.

"D. A. To go and live together, you two?

"A. Yes, sir.

"D. A. What else?

"A. I got up and I told him that I was going and he said 'Are you going?', and I told him 'Yes', and I took two or three steps . . .

"D. A. Why did you tell him you were going?

"A. Because I supposed that he would follow me.

"D. A. What happened?

"A. After I had taken two or three steps I heard a shot and I turned around and called him, because I believed that he had done it to frighten me and when I realized what had happened, I began to look for the revolver.

"D. A. Did you find it?

"A. No, sir.

"D. A. And why did you imagine it was a revolver?

"A. I imagined that it was a revolver because I was with him and I did not see any revolver. Or a pistol, I do not know, I had not seen anything in his pockets.

"D. A. How do you know?

"A. Because I placed my hand like this and I took out something he had.

"D. A. What was it?

"A. A scapulary of the baby.

"D. A.   Where did you look for the revolver?

"A.   Around him.

"D. A.   Did you move the body?

"A.   No, sir.

"D. A.   What did you do then?

"A.   I was about three or four minutes with him.

"D. A.   Doing what?

"A.   Looking for the weapon and seeing if he was really dead because I imagined that it was only to frighten me.

"D. A.   Then what did you do?

"A.   I came to stop 18."   (Statement of the case, pp. 244–246.)

The district attorney also presented the testimony of Josefina Planadeball, wife of the deceased, who testified that on the day of the happenings the deceased was dressed in white, that his revolver was in his night-table and that she delivered it to a detective when the case was being investigated.

The accused, to impeach the testimony of the expert of the district attorney in regard to the paraffin test, presented a printed bulletin published by the Department of Justice, Washington, D.C., of October 1, 1935, dealing with the paraffin test.   When the district attorney had presented all his evidence, the defense prayed the court to direct the jury to bring a verdict of not guilty because the evidence was not sufficient.   The court denied the petition and submitted the case to the jury on the evidence of the district attorney with the result which we know.

Let us now consider the errors assigned by the appellant.

■  The first error states as follows:

"1. The district court erred in permitting a witness to testify as to the so called paraffin test against the objection and exception of the accused."

It is well known that when a firearm is fired, unless white powder is used or unless the weapon used is so well adjusted so as not to permit the escape of gases, the nitrates of the powder adhere to the hand of the person firing it.   So that if nitrates are found on the hand of a person who is suspected to have fired a firearm, it is a circumstance which tends

to show that the person fired a weapon. Therefore, such evidence gives light in any investigation of this kind, and unless there be a legal reason to refuse it, it should be admitted. About fifty or seventy-five years ago the means of detecting the presence or absence of nitrates in relation to the discharging of firearms was found. The procedure was called "paraffin test or Lungeen reaction." The paraffin test is made by applying hot melted paraffin on the part of the body where the presence of nitrates is suspected. With the melted wax, a sort of a glove is formed. When the paraffin cools it is taken off carefully and that part of it which has been in contact with the body, is tested with a certain reagent and if on the body that came in contact with paraffin there existed nitrates, these adhere to the paraffin and on being treated with the said solution, the particles of nitrates adhering to the paraffin turn a deep blue color. Of course, the paraffin test is not absolutely sure due to the fact that under certain circumstances the presence of nitrates on the hand of a person does not mean that he has discharged a firearm. For example, a person who has been smoking or has had his hands in contact with chemical fertilizers, upon being subject to the paraffin test, they would give a positive reaction, that is to say, nitrates would appear. On the other hand, if a person after discharging a firearm washes his hands well, in all probability the result would be negative. The result would also be negative if the powder used is white powder or if the weapon is so constructed as not to permit the escape of the gases produced by the combustion of the powder. For these reasons the paraffin test must be received with certain caution, but this does mean that it should be refused for since we have said before the presence or absence of nitrates on the hand of a person suspected of having discharged a firearm, is a circumstance to be considered together with the rest of the evidence.

In the case of *Commonwealth* v. *Westwood*, decided by the Supreme Court of Pennsylvania on November 23, 1936, 188

A. 304, cited by the prosecuting attorney of this Court it was held that the paraffin test in a case of murder is admissible and competent. In the Westwood case the test was made in the same way as in the present case with the only difference that here it was applied only to the deceased because the accused did not consent to have it applied to her, while in the Westwood case it was applied to the accused and gave a positive result. As it was said in that case:

"The unexplained presence of specks of partially burned gunpowder on defendant's right hand a few hours after the shooting— as chemists found and testified—was, if the jury found such to be the fact, significant. If the victim had been stabbed instead of shot, the unexplained presence shortly thereafter of human blood on the right hand of one who had an apportunity to commit the crime, would have been significant."

And as all evidence which tends to clear up in one way or another is admissible unless its admission be prohibited, the lower court acted correctly in accepting this evidence.

From the evidence of the district attorney the weakness of the paraffin test appears clearly and the jury could not have thought that merely because the paraffin test made on deceased gave a negative result it must necessarily be a case of murder and not suicide. The jury heard all the evidence presented by the district attorney and considering it as a whole, including the paraffin test, it decided that the accused had illegally killed deceased.

In our opinion the first alleged error does not exist.

█ The second alleged error states:

"The district court erred in permitting an expert to testify that deceased had not been in contact with a firearm."

After the expert explained how the paraffin test was made the district attorney questioned him:

"D. A. And you say that it gave a negative result?
"W. Yes, sir.

"D. A.   What does that indicate?

"W.   The absence of nitrates on the hand.

"   *         *         *         *         *         *         *

"D. A.   What does the absence of nitrates indicate?

W.   The absence of nitrates on the hand of deceased indicates to us that the hand had not come in contact with any firearm and had not received the combustion of the same."

In our opinion the answer of the expert is perfectly correct and could not have unjustly prejudiced the rights of the accused.   The determination of whether or not deceased had used a firearm was precisely the object followed in making the paraffin test.

In our opinion the second alleged error does not exist either.

█ The third alleged error states:

"The District Court of San Juan erred in not setting aside the verdict of the jury as being contrary to law and the evidence, and in refusing for that reason to grant the accused a new trial."

The most important question to be determined in this case is whether deceased committed suicide or if someone else killed him.   The evidence shows conclusively that the deceased and accused were alone at the place of the crime and there is no possibility whatsoever of the death having been caused by a third person.   Let us examine therefore all the circumstances surrounding the case in regard to the conduct of the accused and the explanation she gave us of what happened.

In the first place, let us look for the motive for suicide. There is none.   The accused herself tells us that they had had a quarrel but that before the death took place it was all over.   Let us see the explanation given by the accused herself:

"D. A.   About what did you talk?

"A.   Of a trip that I intended to take to New York.

"D. A.   Did you intend to go on that trip alone or with him?

"A.   Alone, my purpose was to spend a couple of winter months there.

"D. A.   Continue.

"A.   He then asked me when was I going and I told him: 'The first week in January.' And he said that he could not let me go alone, that we had to decide our situation.

"D. A.   What situation?

"A.   Our situation.

"D. A.   What was that situation?

"A.   The fact that we were both married.

"D. A.   Continue.

"A.   We talked and he asked me: 'Is that your decision?' and I told him: 'Yes, I am going the first week in January,' because he wanted to go towards the end of January for he had some matters to attend to first. Because he wanted us to stay up there for the time being.

"   *          *          *          *          *          *          *

"A.   I got up and I told him that I was going and he said: 'Are you going?', and I told him 'Yes', and I took two or three steps . . .

"D. A.   Why did you tell him you were going?

"A.   Because I supposed that he would follow me.

"D. A.   What happened?

"A.   After I had taken two or three steps I heard a shot and I turned around and called him, because I believed that he had done it to frighten me and when I realized what had happened, I began to look for the revolver." (Statement of the case, p. 245.)

"   *          *          *          *          *          *          *

"D. A.   The only thing you talked about was your trip to the United States?

"A.   Yes, sir.

"D. A,   There was no quarrel whatsoever?

"A.   No, he told me that he would not let me go alone.

"D. A.   Was that a motive for his shooting himself?

"A.   I don't know, I was never able to imagine.

"D. A.   You had not had quarrels?

"A.   Yes, sir, but nothing had ever happened.

"D. A.   Did you suspect that he might have taken such an attitude?

"A.   No. sir." (Statement of the case, p. 247.)

If some reason had existed for the suicide it is certain that the accused would not have hesitated to testify as to it since such a motive would contribute to her defense.

On the contrary, the evidence shows that if the deceased had any wish it was to live and this is shown by the fact that he loved his wife and his children and on that same day, a few hours before his death, in Marcia Corretger's house he repeatedly stated in the presence of various people and notwithstanding the fact that this was not pleasing to the accused that he did not want to get a divorce, that his wife had given him no reason to do so and that he did not wish to abandon her nor his children.

On the other hand, after a slight study of the evidence we find reasons that the accused might have for killing deceased. The evidence shows that on that day in the lunch at Marcia Corretger's house the accused and deceased had had a quarrel. First, because she had seen him speaking with a woman in the "Wonder Bar" and he had not immediately come to her, she stating that "she came first." Later, on account of the insistence of the accused who pretended that deceased should obtain a divorce and go with her to the United States and his firm resolution of not abandoning his wife and children. Under such circumstances the accused, who stated that "she came first" felt herself defeated by the legitimate spouse of the deceased. Her pride as a woman was hurt. She did not come before the wife, and it is easy to imagine how far a woman will go under such circumstances.

Her state of mind on that day is shown by the note which she left in his office after the discussion at lunch time and which stated as follows: ·

Planas, I love you. If you are mine or not let me know. Always yours up to the hilt."

Her decision was probably the decision which is often reached in such cases: I or nobody. And the only manner of carrying out such a resolution was by killing him, and to insure her safety a few moments previously she searches his pockets and sees that he has no weapons. Let us see what appears from her own testimony:

"D. A. And why did you imagine it was a revolver?

"A. I imagined that it was a revolver because I was with him and I did not see any revolver. Or a pistol, I do not know, I had not seen anything in his pockets.

"D. A. How do you know?

"A. Because I placed my hand like this and I took out something he had.

"D. A. What was it?

"A. A scapulary of the baby." (Statement of the case, 245-246).

The logical and natural thing is that given the character of the wound which instantly killed him or if it did not kill him, at least it left him unconscious, the natural thing we repeat is that the weapon should have remained in his hand or at least very near to it. Nevertheless, the accused looked for it with great interest for three or four minutes according to her testimony and did not find it. It is not possible to think that after receiving a wound such as the deceased received he could have thrown the weapon into the sea which was several meters off from the place where he was when he was shot. There was no other person around there at that time who could have taken the weapon. Is this not a circumstance tending to show that it was a crime and not a suicide? Notwithstanding, a few moments after the happening the accused had a conversation with Modesta Rivas in the room of Marcia Corretger and when the witness was surprised that Planadeball had committed suicide because she had not seen him carrying any weapon, the accused then said that he had his revolver, that she had taken it away from him a few days before but that on that afternoon he insisted that she give it to him and that she gave it to him. At that very moment the accused was putting a revolver in her pocket book taking care to clean it with her hand. Compare these two contradictory statements of the accused and consider also the circumstance that appears from the testimony of Mrs. Planadeball, the deceased's revolver was in his house the day of the accident put away in a night table and it was

delivered by her to the police after her husband died and was offered in evidence.

Another circumstance to be considered in this case is the fact that immediately after the death of deceased, the accused ran and changed her dress and ordered it destroyed, burnt, etc. If it was that the dress brought her memories that she did not want to keep, why did she not also destroy the pocket book, the hat, etc.? Was it not that the dress incriminated her? Why before she had her interview with the Chief of Detectives Lloréns on the morning of December 23 was the accused so careful to go to Marcia Corretger's house and make sure that the dress had disappeared according to her instructions? In an attempt to deny all or some of these circumstances which we have pointed out the defense suggests that all these acts of the accused inconsistent with her innocence were due to the fact that she was a married woman from a distinguished family and did not wish to be involved in a scandal of this kind. This argument does not withstand the slightest analysis before the irresistible force of the facts. Her relations with deceased were not only public but notorious. They did not hide but went out together in the streets and public places of San Juan. She herself tells us in her declaration that on the afternoon of the crime they intended to eat together at ''La Mallorquina'' and later to spend a part of the evening in the ''Escambrón''. She herself testified that they wrote to each other daily through the mails and that sometimes they communicated by telegram. Her own husband, according to her testimony, upon reading on Monday the 23rd the statement made by ''El Mundo'' of the finding of the corpse of Planadeball notwithstanding the fact that her name did not appear, dared to ask her if she was not involved in the matter. Why did he have to suspect his wife in this manner? Was this not an indication that the illicit relations between the accused and deceased were known or at least suspected by the

husband? And the accused did not become indignant upon hearing such words in her husband's mouth!

Besides all these circumstances, there is also the circumstance that the wound presents no powder marks, which according to the expert testimony means that the mouth of the barrel of the weapon was, upon being fired, more than sixteen inches away from the head of the deceased, since if it had been less than sixteen inches away, powder marks would have been apparent. It is not logical to suppose that a person who intends to commit suicide will take the precaution of placing the weapon in such a manner that the mouth of the barrel will be at a distance greater than sixteen inches. And to all this, add the fact if necessary that the paraffin test showed that deceased's hand had no nitrates, notwithstanding the fact that the powder found in the hole of the shot in the hat was of the so called black powder.

It is true that the jurisprudence and experience show that circumstantial evidence should be studied and received with caution but when that proof is, as in the instant case, incompatible with any reasonable theory of innocence, circumstantial evidence is sufficient to uphold a verdict of guilty. In our opinion, the evidence which the jury had before it did not justify any other verdict but that of guilty and if in anything it sinned it was in being too benevolent in not finding her guilty of murder in the second degree. Neither did the judge of the lower court commit any error in refusing a new trial due to insufficiency of the evidence.

The third alleged error does not exist.

■■ The fourth alleged assignment of error states as follows:

"4. The District Court of San Juan erred in ignoring the theory of suicide in its instructions to the jury and in disregarding the avoidances contained in the written declaration of the accused which was presented in evidence by the district attorney."

In the instructions given to the jury there is one which states as follows:

"If the Gentlemen of the Jury, as a result of the evidence adduced, believe that the district attorney has not proven any crime as committed by this accused, *nor that it has been proven beyond a reasonable doubt that the death of Salvador Planadeball was due to any act of the accused; or if the Gentlemen of the Jury believe, as the result of the evidence that Planadeball committed suicide;* or if they believe that there is any reasonable doubt as regards the guilt of the accused, *in any of these cases* the duty of the jury is to bring a verdict of not guilty."

It is true that when a confession or admission of an accused containing avoidances is presented in evidence, the jury should be instructed that said manifestations should be considered as true unless they are refuted. *Yarborough* v. *State,* 67 S.W. (2d) 612; *Combs* v. *State,* 108 S.W. 649. But this rule is not applicable to a case such as the present where the declaration of the accused contains no confession or admission whatsoever. All of it tends to show that the deceased committed suicide and that she had no participation whatsoever in his death.

The cases of *Combs* v. *State* and *Yarborough* v. *State, supra,* are not applicable to the present case. In the first, there was a real admission. In that case the accused admitted that he had killed deceased but that the death was caused by accident, so that there was no criminal intention. It was there upheld that the court of its own initiative should have instructed the jury that it was up to The People to destroy the evidence to the effect that the death had been accidental.

In the second case, that of *Yarborough* v. *State, supra,* an admission was also involved. There the accused admitted that he threw a pail full of gasoline on the deceased which was lit and caused her death but at the same time he stated that he had done so through mistake when trying to take another pail of water which was in the same place.

In the case of *People* v. *Fowler,* 178 Cal. 657, 664, the Supreme Court of California clearly establishes the distinction between a confession and an admission in the following manner:

"A confession, in criminal law, is an admission or statement, by a person accused of a crime, to the effect that he is guilty thereof. 'An admission is distinguished from a confession by the fact that the term "admission", in criminal matters, relates to matters of fact that do not involved a criminal intent, and a confession is an acknowledgment of guilt.' (2 Wharton on Criminal Evidence, 10th ed., Sec. 622 *a.*)"

*People* v. *Elder,* 55 Cal. App. 644, 204 Pac. 29. The fourth error does not exist either.

■ The fifth alleged error is as follows:

"5. The District Court of San Juan erred in giving instructions as to manslaughter in this case and in disregarding the different degrees of the crime, the error having served as a compromise or means of convicting the accused by the jury."

In this assignment of error the accused complains that the court instructed the jury as to voluntary manslaughter.

In our opinion the court was justified in giving such instructions, since from the evidence it appeared that the accused and deceased had had various quarrels on the day of the accident, that they had serious discussions first in Marcia Corretger's house and later again in the beach of the Condado. Besides this, the accused had a scratch on his hand.

The evidence is so strong against the accused, that supposing that there had been no basis in the evidence to give instructions in regard to voluntary manslaughter, the error if it had been committed, far from prejudicing the accused, was beneficial to her and therefore cannot cause the reversal of the judgment.

■ Let us now examine the sixth and last of the alleged errors. It is stated thus:

"6. The District Court of San Juan erred in refusing to give the second special instruction requested by the defense."

This error consists in the fact that the lower court refused to give the following instruction:

"The court instructs the Gentlemen of the Jury that mere suspicions do not constitute proof of guilt. It does not matter how serious and strong these are and the accused should be freely exhonerated unless the fact of her guilt is proved beyond a reasonable doubt by the exclusion of any other reasonable hypothesis of her innocence which may be compatible with the facts proven."

The requested instruction not only tends to confuse the jury by the language in which it is drawn up but it is included in the second general instruction which was given to the jury:

"In this case you heard in the arguments of circumstantial evidence. I have already told you what direct evidence is. There are also two classes of evidence which are classified and admitted by all courts of justice and by virtue of which the jury may declare and find an accused guilty of a crime; one is direct evidence, or that is, that which is produced by the direct or positive testimony of a witness in respect to the commission of a crime.

"I have already explained to you that a person who sees a document signed is direct evidence that the document was signed. That is ocular proof. The other kind of evidence is that which is produced from the testimony in regard to a series of interrrelated facts which tend to show in a sufficiently strong manner the commission of a crime by the accused. This proof which is called circumstantial evidence, may consist in admissions of the accused, in threats made previous to the commission of the crime tending to show that there existed the animosity of the crime, or any other act, declaration or circumstances admitted as evidence which may tend to connect the accused with the commission of the crime. There is nothing in the nature of circumstantial evidence to make it less certain than the other kind of evidence, that is, direct evidence. But the court instructs you that in order to find the accused guilty on circumstantial evidence only, it is not only necessary that all the circumstances should concur to show that he committed the crime of which he is accused, but also that said circumstances be inconsistent with any other reasonable conclusion. It is not sufficient that the circumstances proved coincide or make probable the stated hypothesis in order to establish the object of the accusation, but that must also exclude any other hypothesis except that of the guilt of the accused. That is to say, that in

cases in which the evidence is circumstantial, facts should be proven which are not only compatible with the guilt of the accused, but which are also incompatible with any reasonable hypothesis of innocence; and each separate fact from which the guilt is to be deduced should be shown by means of evidence which will satisfy the mind and conscience of the jury in the same manner as it is necessary to satisfy them with respect to the facts in question in cases in which the evidence is direct."

Since a court is not bound to give a special instruction which has been covered by the general instructions, we must reach the conclusion that the sixth and last alleged error was not committed. As none of the six alleged errors exist, nor have we been able to find that any other error was committed after examining the record, which might have substantially prejudiced the rights of the accused, the judgment appealed from should be affirmed.

Mr. Justice Travieso took no part in the decision of this case.