Commonwealth *v.* Butler, Appellant.

Argued September 30, 1940.   Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Albert Martin,* for appellant.

*John F. Haggerty,* Assistant District Attorney, with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, October 28, 1940:

Defendant, Celie Butler, having killed her husband, was found guilty of murder in the first degree and the jury fixed the penalty at life imprisonment. After a new trial was refused and sentence imposed, she took this appeal.

The facts are not complicated and can be stated briefly. Defendant and Charles Butler were married in South Carolina. In 1925 they took up their residence at Brackenridge, Allegheny County, and Butler found work as a laborer in a local steel plant. Their family life was not happy, she accusing him of maintaining illicit relations with Reeva James, the wife of her son by a prior marriage. On Wednesday, April 26, 1939, at about 12:15 a. m., she appeared at the police station of the Borough of Brackenridge and reported that she had killed her husband. She was taken by officers to her house, where Butler was found dead, lying on a couch in the kitchen, he having died from a shotgun wound in his left temple.

The Chief of Police testified that when defendant appeared at the police station, she said, "We had a little spat, that's all. He threatened to kill me. He said, 'One of us is going to hell tonight, you or I, one of us.' I killed him." Another officer testified that at her home, at the request of the officers, she enacted the manner of the killing, and that she then stated that her husband

had returned home late that evening and had quarreled with her; that he took the shotgun, loaded it, and placed it at the head of the couch where he lay down, saying, "Somebody is going to hell tonight"; that she waited five minutes until she thought he was asleep; then picked up the gun, pointed it at his head and fired. The officers said she appeared calm and collected throughout the proceeding.

At the trial, however, defendant told a decidedly different story. She said in effect that the killing was an accident. She explained the happening by saying that she attempted to take the gun to put it out of her husband's reach; that he heard her and, suddenly reaching out, took hold of it; that as she pulled back, her "hand hit the trigger and the gun went off." She insisted she had no intention of killing him.

The contrary is decisively indicated by the testimony of Commonwealth witnesses. A number of them testified that during the week before the tragedy, in fact down to the very hour it happened, defendant advertised the fact that she intended to take her husband's life. Reeva James said that two days before, she told her that she intended to kill him. Julia Sellers testified that defendant talked to her on the Sunday prior to the killing, and said she was going to blow his brains out. The same witness testified that on Tuesday, the day before the slaying, defendant again told her that she was going to murder her husband. Ambrose Guyton stated that she said to him on the afternoon before the homicide that he would hear something before morning. Mrs. Rosalie Gilchrist testified that the Sunday before, defendant showed her two shotgun shells and said, "This sure is—if Charlie lay his head in this house, I'm going to kill him." Mrs. Gladys Powell said that she saw defendant about 11:30 Tuesday night, within an hour of the killing, and that she then told her that she had stood it as long as she could and someone would have to go. Enzella Combs testified that he saw defendant about twenty minutes to

twelve Tuesday night, also within an hour of the killing, and that she told him "If you want your friend . . . to live, . . . tell him not to sleep in this house tonight." All of which shows defendant fully apprised the neighborhood of her intention to kill her husband.

Defendant made a sweeping denial of all the threats which these witnesses alleged she made. She testified that she knew her husband was consorting with Reeva James, but that she was not jealous, and that she did not care. She offered evidence to show that her husband had beaten and abused her on numerous occasions and that he had made threats against her life.

It is clear that there was much testimony which, if believed by the jury, would properly lead to the verdict that the killing was wilful, deliberate and premeditated. That defendant had considered such action for some time cannot be doubted and that she knew and understood thoroughly what she was doing is beyond contradiction. She deliberately committed the crime with the definite intention of taking human life.

The principal assignment of error alleges that the learned trial court erred in permitting the District Attorney "to inflame the passions and prejudices of the jury by producing twenty-two life insurance policies, in full view of the jury, as a motive by the defendant for the homicide, . . ." The learned court en banc explained the situation concerning the production of the policies and adequately disposed of this objection on its merits in these words: "The Commonwealth offered in evidence insurance policies upon the life of the deceased, in which the defendant was the beneficiary. Although there was testimony concerning some twenty-two policies, it was explicitly stated that none of them could be introduced in evidence unless the defendant were named as the beneficiary. The defendant objected to the introduction of such testimony, which objection was finally sustained, and the Jury told to disregard any statements concerning any insurance policies. The de-

fendant contends that the display of policies in the custody of the Evidence Custodian before the Jury was so highly prejudicial that a new trial should be granted, for this reason. None of the policies were received in evidence, and the Jury was carefully and fully instructed to totally disregard insurance as a motive for the killing." The learned trial court had said to the jury: "In order to clear this record, members of the jury, we will sustain the objection heretofore made by the defense as to any insurance policy taken out on the life of the deceased, because there is no evidence here that the Commonwealth can prove that [any policy] has been taken out shortly before the death of the deceased, or that she had said at any time that she intended to kill the deceased because of the insurance; consequently we will eliminate from your consideration any evidence concerning any insurance policies as a motive for the killing. All evidence pertaining to insurance policies, as a motive for the killing, is stricken from the record." We are certain that defendant suffered no prejudice and that the jury was not influenced by the offer or rejection of these policies. The trial court made it very clear that they were stricken from the record. This satisfied defendant's counsel, who then said to the court, "In other words, your Honor, these policies have nothing to do with this case?" To which the court replied, "That is just what I told the jury." No objection was made in behalf of defendant nor any motion made to withdraw a juror.

Another assignment complains of the action of the trial court in failing to charge the jury as to the law on self-defense. At the trial there was no pretense that anything but "accidental killing" was relied on as a defense. The defendant by her own testimony claimed that the killing was an accident. It was for this reason that the learned trial court very properly omitted to charge the jury as to the law on self-defense. Furthermore, no request was made for such a charge.

There is no merit in any of the assignments of error and, therefore, they are dismissed. Defendant had a fair trial; overwhelming testimony convinced the jury, beyond a reasonable doubt, of her guilt of murder of the first degree, all the elements of which appear in the case.

Judgment affirmed.