## Commonwealth v. Fry

*Harry B. Crytzer*, district attorney, for Commonwealth.

*W. Justin Carter*, for defendant.

RICE, P. J., March 27, 1941.—At the November sessions, 1940, defendant was tried before a jury on an indictment containing three counts, charging (1st) burglary of a vacant tenant house of Norman A. Brookhart, the prosecutor; (2nd) larceny from the said house of five sets of window sash, with glass, the property of the prosecutor; and (3rd) burglary of a barn of the prosecutor and larceny therefrom of certain articles, the property of the prosecutor; and was found guilty of all three counts.

Defendant made a motion for a new trial, assigning five reasons in support thereof, which we will call original reasons, and, after the transcript of the testimony and the charge of the court was filed, filed five additional reasons in support of the motion. The motion was argued on March 4, 1941, by counsel for defendant and the district attorney.

The first original reason in support of the motion is that the verdict was against the evidence. The house and barn burglarized were on the tenant farm of the prosecutor, who farmed the fields, but no one lived on the farm. On Saturday, May 4, 1940, while the prosecutor and his son were ploughing in a 16-acre field of this farm, they saw an automobile near the house and two men walking towards the car, which was near the house, and carrying something, which they put into the car. At that time the prosecutor and his son were about 500 or 600 yards from the house. A lane runs from the buildings towards and along the side of this field and then to the public road leading in an easterly direction towards Centerville. As the prosecutor and his son ploughed towards the side of the field next to the lane, they saw the car coming in the lane towards them and, when they were about 50 yards from the lane, the car passed in front of them in the lane and they saw defendant driving the car and saw that the other man in the car was George Fry, a brother of defendant. The car was a Chevrolet car, of a grayish-blue color, somewhat bleached off. Defendant was wearing a reddish brown coat. This occurrence took place between nine and eleven o'clock in the morning. As this car came upon the public road, it turned in an easterly direction towards the house of George Fry, which was about two and one-half miles in an easterly direction from the prosecutor's farm. On the following Monday the prosecutor went to the buildings on his farm and found that force had been used to enter the house, that five sets of window sash, with glass, had been removed from the frames of the

house, a door had been removed from a door frame of the house, a door lock had been removed from another door in the house, and two iron singletrees had been removed from a riding corn worker in the wagon shed, which was built against the barn. Mrs. Bertha Mangle and her daughter Thelma live in a house along this same public road about one mile beyond Centerville, and a lane leads from this road along the side of her house and within five or six feet of it to a house about 100 feet distant from her house. At the time of this occurrence George Fry and his wife and children lived in this latter house and defendant was staying with his brother. On the morning of May 4, 1940, defendant was seen by Mrs. Mangle and her daughter driving a grayish Chevrolet car, in which was another man whom they did not know, past their house and out on to the said public road and turning it towards Centerville, which was between the Mangle house and the farm of the prosecutor. About ten o'clock the same morning they saw Paul Fry drive the same car into the lane by backing it from the public road past their house to a point at or near the house where George Fry lived, with another man, whom they did not know, in the car, and they saw window sash standing on the floor of the car back of the front seat. On May 9, 1940, State motor policemen saw certain marks on the soft ground of the lane leading to the buildings of the prosecutor made by automobile tires and the same marks on the said public road going towards Centerville until this road joined the macadam road and found the same marks in the lane leading past the Mangle home. At the porch of the house where George Fry lived at the time of the crime they found several penny postal cards with the name "Paul R. Fry" on them. Later they saw a 1927 Chevrolet coach, grayish in color, faded, with disk wheels, having two tires not in good shape, which the defendant admitted to them was his car. They found certain characteristics of the tires that would cause identically the same tire marks they had found. They found, on May 14, 1940, on the premises in Snyder County where they

found defendant and George Fry living and arrested them, ten sets of window sash, which the prosecutor identified as his property and fitted into the window frames of his house. They also found on the same premises the iron singletrees and the door, which the prosecutor identified as his property. At the house on these premises they found the car, bed, and trunk of defendant, which defendant admitted belonged to him. They had some conversation with defendant at different times, during which he made incriminating statements. All this evidence, together with a lot of details which we do not deem it necessary to state, was certainly sufficient to carry the case to the jury. Defendant took the witness stand and denied any connection with the crime and claimed that, during the morning of the crime, he was at another place or places and was not, at any time, on the farm of the prosecutor. He also denied making any incriminating statements. His alibi was so well supported by the testimony of his mother, the wife of his brother George, and the father of George's wife that it had indications of being fabricated testimony. We are fully convinced that the verdict was not against the evidence and that the evidence justified the verdict.

The second original reason is that the jury did not give defendant the benefit of a reasonable doubt. No complaint has been made that the court did not adequately or correctly instruct the jury on the law relating to the presumption of innocence or reasonable doubt. The court, in the last preceding paragraph of his opinion, has come to the conclusion that the verdict was in accordance with, and justified by, the evidence, and we will presume that the jury complied with the instructions of the court, considered the testimony, determined the credibility of the witnesses, and had no reasonable doubt of the guilt of defendant.

The fourth original reason is that the court "failed to properly instruct the jury relative to the goods found on

the premises where defendant resided, to wit, that no presumption of guilt arose against defendant unless the Commonwealth proved that said premises were in the control or possession of defendant," and the fifth original reason is that the court failed "to instruct the jury that the mere fact that goods (stolen) were found in the house where defendant resided is not evidence of possession by him." Defendant's counsel made no request to the court, either by written points or verbally, to charge the jury as stated in these reasons, although, at the end of the charge, the court gave counsel an opportunity to request additional instructions. The evidence showed that defendant and his brother George were both concerned in this crime and were at the scene of the crime at the time it is alleged to have been committed, that they were living at the same house near Centerville at the time, that they removed to Snyder County on the day of the crime or the next day, that they were living on the same premises on May 14, 1940, when and where they were arrested, and when the premises were searched and the window sash were found on the Snyder County premises. Defendant then had his car, bed, and trunk at these premises. George Fry, the accomplice of defendant, lived there with his wife and children, and even if defendant and his personal property had not been found there, the possession of these sash and other stolen goods by George Fry could properly be held to be the possession of the defendant. Possession does not mean exclusive possession, so as to exclude any possession or control by any other person; but when two or more persons have possession or control of any real or personal property, each of them may be said to have possession or control. And when two or more persons are engaged in a common or joint affair relating to property, the possession of one is the possession of all. In Commonwealth v. Burke, 74 Pa. Superior Ct. 320, the court said:

"It was entirely competent for the Commonwealth to produce evidence that the goods charged in the indictment to have been stolen were shortly thereafter found

in the possession of the defendants, *or some of them.*" (Italics supplied.)

The court could not properly have instructed the jury as stated in these reasons. We gave no instructions as to any presumption arising from the discovery of the goods, and defendant has no cause for complaint.

The first additional reason alleges error in overruling defendant's objection to the offer of the Commonwealth to show by Mrs. Bertha Mangle that defendant was seen by her in the morning of the day of the crime driving his automobile with the stolen windows in the back seat of his car. Counsel for defendant stated that, unless the Commonwealth intended to identify the windows in evidence (exhibits 3 and 4) as the windows the witness saw, he objected, and that, if the Commonwealth proposed to prove that the witness saw defendant with windows like those, he objected, and that, in order to make it clear, he would cross-examine the witness. The objections depended, for their validity, upon the nature of the testimony to be given under the offer and were conditional, not absolute objections. Counsel could not cross-examine the witness prior to the ruling of the court in order to determine whether the testimony of the witness would come up to the offer; he could cross-examine after the court admitted the offer for the purpose of testing the ability and opportunity of the witness to observe the window sash; and, if it should then appear that the testimony did not come up to the offer, he could move to strike out the testimony. Testimony that the stolen goods, or some of them, were seen, on the day of the crime, in the possession of defendant had great probative value and was strong evidence of guilt: Commonwealth v. Burke, 74 Pa. Superior Ct. 320; Commonwealth v. Dattala, 77 Pa. Superior Ct. 320; Commonwealth v. Agato, 63 Pa. Superior Ct. 274; Commonwealth v. Wilston, 73 Pa. Superior Ct. 161. When the offer stated that defendant was seen by the witness in possession of some of the stolen goods, sufficient facts were averred to make the offer admissible.

However, it is doubtful whether any testimony regarding the window sash was elicited under the offer. The first testimony of this witness relating to the sash was as follows: "Q. What did you see then? A. Window sash." At this point counsel for defendant interrupted with a general objection and asked the witness: "Q. Do you know where those window sills came from, do you know of your own knowledge where those window sills came from, that you saw in the car?" and the witness replied: "All I know, I saw window sash in the car." Counsel objected generally, and the objection was overruled. A responsive answer to the question of counsel would have been "Yes" or "No," and counsel should have moved to strike out the answer if he regarded it as unresponsive (Commonwealth v. Hay, 80 Pa. Superior Ct. 503), but he made no such motion and he could not object to his own question. Thus, the second additional reason is without merit. Later, the district attorney asked the witness: "Would you say these are the same window sashes or panes?" Counsel objected to the question at once, and the court overruled the objection, but the district attorney did not press the question and asked other questions and the witness did not answer. The examination of the witness then proceeded as follows:

"Q. What makes you say these are alike the same sash you saw in the back of the car, in what respect are they alike?

A. They are weather beaten the same.

Q. Do the panes of glass resemble or differ from the ones you saw in the car?

A. They resemble the ones in the car.

Q. Then, Mrs. Mangle, would you say these are the same, or just like the window sash you saw in Paul Fry's car?

A. They are the same."

No objection was made to this testimony, but the third additional reason may be considered as applying to it.

The objections of counsel to this line of testimony relate to the answers of the witness and not to the questions put to her. Questions to the witness to elicit testimony that she saw window sash in defendant's car and that the window sash in evidence resembled those in the car or were the same as those in the car were entirely proper under the circumstances, for it had been testified that the witness saw defendant drive his car, past her house, from the home of George Fry and back later the same day, on the morning of the crime, and the window sash were in his car on his return trip, and that her home was about 2½ miles from the scene of the crime. It was not necessary for the Commonwealth to prove the absolute identity of the window sash in evidence with those the witness saw in defendant's car: Commonwealth v. Agato, 63 Pa. Superior Ct. 274; Commonwealth v. Wilston, 73 Pa. Superior Ct. 161. If she had testified to nothing more than that she saw window sash in the car, her testimony would have been proper under the circumstances. If she testified somewhat differently at different times, her credibility and the weight to be given to her testimony were for the jury: Commonwealth v. Reid, 123 Pa. Superior Ct. 459. But her testimony that she saw window sash in the car, and as to this she did not waver or contradict herself, was sufficient to go to the jury. Testimony to prove identity is not necessarily made up of the testimony of one witness; one fact may be proved by one witness, another fact, by another witness, and so on, until a series of facts has been proved tending to prove the identity of the goods found with those stolen, as the cases above cited show. Hence, we are of the opinion that the testimony of Mrs. Mangle was proper.

The fourth additional reason raises the same questions as to certain testimony given by Thelma Mangle, and what we have said as to the testimony of Mrs. Bertha Mangle on the matter of identity of the window sash applies to this reason.

The third original reason is as follows: "The Commonwealth during the trial of said case elicited the testimony that, when the premises where the defendant temporarily resided was searched, that among other things found thereon was a revolver and several guns; without proof that the said guns were the property of the defendant and without attempting to offer said guns in evidence and under no allegation in the indictment that this said revolver and guns were stolen, (the Commonwealth) placed said guns and revolver in front of the jury at and upon the witness stand, thereby unjustly prejudicing the jury against the defendant; counsel for the said reason moved the Court to withdraw a juror and continue the case. The learned Court erred in refusing the motion of the defendant."

The fifth additional reason is as follows: "Paul L. Pochyba was called as a witness for the Commonwealth and asked: 'Tell the members of the jury what you found there?' The witness answered, 'window sash, five sets of windows. We found two iron singletrees, three rifles, two shotguns and a .38 pistol.' The court, upon motion of defendant, ordered the testimony relating to 'three rifles, two shotguns and a .38 pistol' stricken from the record. The two shotguns, three rifles, and the .38 pistol with exhibits 1 and 2 (the singletrees) were at the time in front of the jury and remained so the greater part of the trial. The district attorney in his closing address to the jury referred to the shotguns, rifles, and .38 pistol, saying that defendant lived in a house with an arsenal of guns in it, thereby prejudicing the jury against defendant. Whereupon defendant moved that a juror be withdrawn and the case continued. The learned court erred in overruling the motion of defendant."

The name of the witness to the finding of the guns was Joseph L. Pochyban, a member of the Pennsylvania State Motor Police. The president judge did not, at any time, see the said firearms. After the testimony of this officer

as to these firearms, the record discloses that no further mention of them was made until Saturday, November 23, 1940, soon after the court convened at 9 a.m., when counsel for defendant made the following statement: "I noticed this morning some guns and a revolver lying there where the jury can see them. They were not offered in evidence, but were referred to yesterday. Those guns and rifles are like a regular fortress lying in front of the jury, and they are such as to have a tendency to prejudice the jury. They were not offered in evidence, and I ask that a juror be withdrawn and this case continued." The court overruled the motion, stating that from the presence of the guns in the courtroom it was not to be inferred that they were connected in any way with the case. Counsel for defendant merely supposed that the firearms seen by him in the courtroom were the same as those testified to by Officer Pochyban; nothing was said or done to show to a certainty that they were the same. Counsel's statement indicates that the firearms were not in the courtroom until Saturday morning, which was after testimony on both sides was closed. The district attorney stated that, when he came into the courtroom on Saturday morning, and at the time only nine jurors were in the jury box, he saw some firearms and at once ordered their removal from the courtroom and the firearms were then removed. This was before counsel for defendant made his statement, which in itself shows the firearms were not present when he made the statement. Now, this statement was made at side bar, and apparently the jury did not hear it. After counsel made this statement, he made his closing argument to the jury, and immediately the district attorney addressed the jury. At the close of this address counsel for defendant, loudly enough for the jury to hear, made this statement:

"I renew my objection that a juror be withdrawn and this case continued. As I remarked before, when I entered the courtroom, these guns, which were not offered

in evidence, and which have no right to be here, were lying on the floor in the presence of the jury, for the purpose of making a decisive impression on the jury; and the district attorney in his closing arguments to the jury made the statement to the jury that this man, referring to defendant, lives in a house with an arsenal of guns in it. What is the implication to be drawn from that remark? Does he want the jury to draw from the fact that these guns were in the house, that they were the property of defendant, when these guns were not offered in evidence? I submit . . . that is unfair to defendant in this case, that is not warranted, and I renew my motion."

The court overruled the motion. In the early part of the charge to the jury the court said:

"And in particular reference to the statement made by counsel just a few minutes ago, you should not consider the matter of any firearms found in the home of the Frys in Snyder County, or any that may be present in court today; they are not in evidence and they have nothing to do with this case." If counsel had not made a reference to the firearms loudly enough for the jury to hear it, the jury would have had no reason to believe that any firearms they saw were in any way connected with the case and might have supposed that the firearms had something to do with the next case to come before the court. What counsel said in the hearing of the jury tended to magnify the importance of the occurrence, and if the situation created any prejudice against defendant, his counsel was principally responsible. The court very clearly instructed the jury that the firearms were not in evidence, had nothing to do with the case, and were not to be considered by the jury, and it may be presumed, under the circumstances, that the jury acted according to the instructions of the court. And we are not persuaded that the jury were prejudiced against defendant. The testimony tending to prove the guilt of defendant was so strong and convincing that it is probable that the jury

was influenced only by the evidence. Apropos to the situation arising from these firearms are the following excerpts from the opinion of the Supreme Court in Commonwealth v. Meyers, 290 Pa. 573, 579, 581:

"It is to be noted that the remarks complained of were made before the trial actually began. It was simply one of those many incidents which occur during the opening of court to which jurors, as a rule, give little heed. Had they been made after the jury had been impanelled to try the case, there would be a great deal of force in appellant's contention. . . . Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not fairly weigh in his behalf such circumstances of doubt, extenuation or degree of guilt that may be present in the case, and thus make them unable to render a true verdict. The remarks of the district attorney in this case were merely an opinion on the evidence as narrated. Where the result of the trial is, as in this case, a correct finding, it would require much stronger language than that complained of to cause us to declare a mistrial: Com. v. Daily, 280 Pa. 59, 64, 65; Com. v. Marshall, 287 Pa. 512, 513-14." In Newman et al. v. Commonwealth, 8 Sadler 127, a trial of coal miners and others for conspiracy, counsel for the Commonwealth, in his closing address to the jury, by leave of court, despite objections, exhibited to the jury a copy of "Puck" containing a cartoon of an uncomplimentary nature, with certain representations of human beings to which the names of defendants had been attached, and the Supreme Court affirmed the conviction, holding that there was no error in the action of the court below. In Commonwealth v. Weber, 167 Pa. 153, it was held no ground for reversal in a murder case that defendant had been brought into

court in handcuffs in the presence of the grand jury. In Commonwealth v. Salawich, 28 Pa. Superior Ct. 330, during the trial, the court called one of the defendant's witnesses before the court and, in the presence and hearing of the jury, charged the witness with perjury in his testimony and held him to bail on the charge of perjury and ordered him taken into custody, and the judgment was affirmed. In Commonwealth v. Pugarelli, 88 Pa. Superior Ct. 171, it was held that the court below did not err in refusing a mistrial, where the district attorney, in the hearing of the jury, asked the sheriff to take defendant into custody because he was late in coming into court. In Commonwealth v. Reid, 123 Pa. Superior Ct. 459, defendant, being tried for robbery, became boisterous, violent and vicious because the court would not continue the case and it became necessary to put handcuffs on him, and it was held the court did not commit error in proceeding with the case. In Commonwealth v. Butler, 340 Pa. 162, a murder case, the Commonwealth produced in court and offered in evidence 22 life insurance policies on the life of the deceased, and the policies were rejected as evidence, and the Supreme Court said: "We are certain that defendant suffered no prejudice and that the jury was not influenced by the offer or rejection of these policies." We have, in these cases, examples of episodes in criminal trials that had greater possibilities of prejudice to defendants than the firearms episode in the instant case. In any case there is the possibility that something happens that the jury should not know about, but it is impossible to seal up the eyes and ears of a jury so that they see and hear only what the law intends them to see and hear. In this case, if the firearms had been brought into court when Officer Pochyban was on the witness stand and they had been marked by the stenographer and then identified by the witness as things he had found on the Snyder County premises where defendant and his brother George were

arrested and where they lived and then offered in evidence but rejected, the mere presence of the firearms in court in the presence of the jury would not have been cause for a mistrial and may not have been objected to by counsel. Generally objects intended to be offered in evidence are brought into court and produced before the jury, and it is only in an unusual case that the presence in the court of objects rejected as evidence would be considered as improper and prejudicial. We are not convinced that in this case there was any prejudice to defendant.

With respect to the alleged improper remark of the district attorney to the jury, we think it sufficient to apply the rule laid down by the Supreme and Superior Courts in many cases, a few of which are: Commonwealth v. Weber, 167 Pa. 153; Commonwealth v. Tauza, 300 Pa. 375; Commonwealth v. Wilcox, 316 Pa. 129; Commonwealth v. Westwood, 324 Pa. 289; Commonwealth v. Trimarchi, 133 Pa. Superior Ct. 307; and Commonwealth v. Lynott, 133 Pa. Superior Ct. 565. According to this rule, counsel for defendant should have interrupted the district attorney immediately when he made the alleged objectionable remark and asked the court to instruct the stenographer to take down the objectionable remark or remarks and then moved for the withdrawal of a juror, but this practice was not followed and counsel waited until the district attorney finished his address. And counsel has nothing in the record to support his claim that an objectionable remark was made. Hence, we cannot sustain this feature of the motion for the withdrawal of a juror.

### Order

And, now, March 27, 1941, the motion for a new trial is denied, and the sheriff is directed to bring defendant into court for sentence.